# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE NOV 2 7 2013

*Madsen, C.J.*
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on 11/27/13

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| In the Matter of the Custody of B.M.H. ) | No. 86895-6 |
| ) | |
| MICHAEL HOLT, ) | |
| ) | |
| Respondent, ) | |
| ) | En Banc |
| v. ) | |
| ) | |
| LAURIE HOLT, ) | |
| ) | Filed ___ NOV 2 7 2013 |
| Petitioner. ) | |

GONZÁLEZ, J.—B.M.H.'s natural father died six months before he was born. His mother's former boyfriend, Michael Holt, was present at B.M.H.'s birth and, shortly afterward, married his mother, Laurie Holt. Mr. Holt has petitioned for third party custody under chapter 26.10 RCW or, alternatively, an adjudication of de facto parentage. The primary question for review is whether, under *In re Parentage of M.F.*, 168 Wn.2d 528, 228 P.3d 1270 (2010), no former stepparent may bring a de facto parentage petition. We are also asked to decide whether there was adequate cause to support Mr. Holt's nonparental custody petition.

We find Mr. Holt has not met the high burden imposed on those seeking third party custody. However, we find he is entitled to maintain his de facto parentage action. The Court of Appeals correctly concluded that our holding in *M.F.* does not bar Mr. Holt from petitioning for de facto parentage The legislature inevitably did not contemplate every conceivable family constellation, and drawing an arbitrary categorical bar based on an individual's status as a stepparent or a former stepparent would preclude legitimate parent-child relationships from being adjudicated. Unlike the specific factual scenario in *M.F.*, the circumstances claimed by Mr. Holt have not been contemplated by the legislature and addressed in Washington's statutory scheme. Mr. Holt alleges that Ms. Holt, B.M.H.'s only other parent, consented to and fostered his parent-child relationship with B.M.H., and we have already held that by requiring consent to be proved, the de facto parentage test adequately protects parents' fundamental rights. *See In re Parentage of L.B.*, 155 Wn.2d 679, 701, 712, 122 P.3d 161 (2005). We affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

## I.    FACTS AND PROCEDURAL HISTORY

Ms. Holt and Mr. Holt began a romantic relationship in 1993 and had a son, C.H., in 1995. The couple separated in 1998, without having married, and Ms. Holt soon became engaged to another man. Unfortunately, her fiancé died in an industrial accident in 1999 while she was three months pregnant with his biological child, B.M.H.

Mr. Holt provided significant emotional support to Ms. Holt during the pregnancy, was present at B.M.H.'s birth, and even cut B.M.H.'s umbilical cord. Mr. Holt and Ms. Holt married shortly after B.M.H.'s birth but divorced in 2001. The resulting parenting plan designated Ms. Holt as C.H.'s primary residential parent and gave Mr. Holt residential time every other weekend. The parenting plan did not include provisions for B.M.H., but the parties do not dispute that B.M.H. essentially followed the same visitation schedule as C.H.

Mr. Holt was actively involved in B.M.H.'s life. In 2002, Ms. Holt changed B.M.H.'s last name from the biological father's last name to Mr. Holt's last name. Ms. Holt and Mr. Holt discussed Mr. Holt's adopting B.M.H. in 2007, but according to the guardian ad litem (GAL), adoption was not pursued because of the effect it might have on the survivor benefits that B.M.H. receives by virtue of his biological father's death.

Ms. Holt married another man in 2007 but divorced in 2008. During that relationship, Mr. Holt claims that Ms. Holt started to separate B.M.H. from Mr. Holt's visitations with C.H. In the summer of 2009, C.H. moved in with Mr. Holt. The parties dispute the reason for the move.

In late 2009 or early 2010, Mr. Holt learned that Ms. Holt planned to move with B.M.H. from Vancouver, Washington, to her new boyfriend's home in Castle Rock, about 50 miles away. On February 23, 2010, Mr. Holt filed a nonparental custody petition, alleging that Ms. Holt was not a suitable custodian for B.M.H. He

explained that Ms. Holt "is threatening to move [B.M.H.] out of the area and thus disrupt the close relationship that [he] and [B.M.H.] have together." Clerk's Papers (CP) at 4. Mr. Holt also asked the court to find that he was B.M.H.'s de facto parent. Mr. Holt alleged that "[Ms. Holt] held [him] out as the child's father in all respects"; that he and B.M.H. are "extremely bonded"; and that "[B.M.H.] refers to [him] as his father." CP at 4.

Mr. Holt submitted a declaration with his petition. Mr. Holt's declaration recounted his visitation history with B.M.H. after he and Ms. Holt divorced:

> Since the time of our divorce when Laurie does not have a boyfriend or husband in her life we communicate fabulously and we don't have issues with regard to our residential time with the children. However, Laurie also has a disturbing pattern of getting into multiple and very short-term relationships with other men and frequently during those times she has on occasion tried to limit my involvement with our son, [B.M.H.].

CP at 20. Mr. Holt's declaration stated that during Ms. Holt's first subsequent marriage she "made some minimal efforts to reduce my time with B.M.H." *Id.* Mr. Holt described an occasion when Ms. Holt told him that he could no longer see B.M.H. because he had given B.M.H. a birthday card from B.M.H.'s maternal grandparents against her wishes. Mr. Holt stated that in August 2007, when Ms. Holt started to date the man she married in December 2007, "she began to pull [B.M.H.] away from seeing me. For the first time in [B.M.H.]'s 8 year life[, she] began splitting [B.M.H.] and [C.H.] up during visitation." *Id.* Ms. Holt divorced that husband in 2008, and according to Mr. Holt, "Laurie has had a number of

4

relationships since her divorce in 2008 . . . . However, fortunately until now Laurie has not allowed these relationships [to] interfere[] with my relationship with [B.M.H.]" CP at 21. He further stated that after Ms. Holt's 2008 divorce, she has "started relationships and moved several different men in and out of her home in Vancouver. These relationships have been confusing and disruptive to [B.M.H.]." CP at 22.

Along with his declaration, Mr. Holt submitted copies of a photograph album that Ms. Holt made him for Father's Day, which contained handwritten captions such as, "The first time you met your son, [B.M.H.]" and "There was no doubt he is your son," as well as a photograph of the order changing B.M.H.'s last name to Mr. Holt's last name. CP at 49-52.

Mr. Holt also submitted declarations from a co-worker and from his wife before Ms. Holt, describing him as a dedicated father. Mr. Holt's former wife stated:

> Over the 10 years I have known [B.M.H.], Michael has never treated him any differently than any of his other children. [B.M.H.] is as loved and as nurtured as his brother [C.H.]. . . . I can say state unequivocally that [B.M.H.] sees Michael as his one and only father and he is as loved and bonded with Michael as any boy to his father.

CP at 29. Her declaration also states:

> Over the years I've watched as . . . Laurie[] has attempted to bring other boyfriends, of often transitory and short term relationships, into [B.M.H.]'s life. On some of those occasions Laurie has tried to limit Michael's involvement with [B.M.H.] for short periods of time when she has a new boyfriend and wants him to be involved in [B.M.H.]'s life.

CP at 30.

The court ordered a GAL at Mr. Holt's request and ordered Ms. Holt to keep B.M.H. in his Vancouver school pending the GAL's report and to continue to allow Mr. Holt regular residential visitation with B.M.H.

On March 24, after a hearing, the court found that Mr. Holt had established a prima facie case for de facto parentage. Ms. Holt moved for revision, and before the revision hearing this court issued *M.F.*, 168 Wn.2d 528. The parties debated *M.F.*'s effect on Mr. Holt's de facto parentage action, and after two hearings, the trial court granted Ms. Holt's revision motion and dismissed Mr. Holt's de facto parentage action, finding that "*M.F.* . . . excludes [Mr. Holt from asserting a de facto parentage cause of action] based on his former marriage to [Ms. Holt] and on the filing of a nonparental custody action." CP at 299-300.

On May 19, the GAL submitted a report stating that B.M.H. viewed Mr. Holt as a father and that it would be detrimental for B.M.H. to terminate contact with Mr. Holt.

Before the adequate cause hearing on the nonparental custody action, Mr. Holt submitted two more declarations—one by his mother and one by Ms. Holt's father, stating that B.M.H. viewed Mr. Holt as his father. At the adequate cause hearing, Mr. Holt informed the trial court that "removing [him] from [B.M.H.]'s life as his father" would be detrimental to B.M.H.'s growth and development.

On August 20, the trial court found that adequate cause existed to proceed to a show cause hearing. The adequate cause finding reads:

6

> The Guardian Ad Litem has testified that it is in the child's best interest to have a continued relationship with the petitioner, [Mr. Holt]. Based upon all the affidavits, declarations and guardian ad litem report, the Court believes there is enough documentation set forth to proceed to trial on the non parental custody petition. The Court finds that if the Respondent/mother denies contact between Petitioner and minor child it would cause actual detriment to the minor child's growth and development if the relationship between the minor child and the Petitioner is not protected, and the Court has concerns that the mother may withhold visitation contact in the future.

CP at 155. At Mr. Holt's request, the trial court appointed an expert to determine "whether actual detriment would result in the termination of the relationship between Michael and [B.M.H.]" CP at 145.

Ms. Holt moved for discretionary review of the trial court's adequate cause finding under RAP 2.3(b)(2). After receiving CR 54(b) certification from the trial court, Mr. Holt appealed the trial court's dismissal of his de facto parentage action. The Court of Appeals granted discretionary review of the trial court's adequate cause finding and consolidated review with Mr. Holt's de facto parentage appeal. The Court of Appeals reinstated the de facto parentage petition and affirmed the order for a show cause hearing on the nonparental custody petition. *In re Custody of B.M.H.*, 165 Wn. App. 361, 267 P.3d 499 (2011). Ms. Holt petitioned this court for review, which we granted. *In re Custody of B.M.H.*, 173 Wn.2d 1031, 277 P.3d 668 (2012).

## II. ISSUES

(1)  Whether Mr. Holt established adequate cause for a show cause hearing on his nonparental custody petition.

(2)  Whether Mr. Holt is barred from proving that he is B.M.H.'s de facto parent.

(3)    Whether either party should be awarded attorney fees.

### III.    ANALYSIS

In parentage and child custody disputes we afford considerable deference to parents as we balance their fundamental right to make decisions concerning the care, custody, and control of their children with the interests of other parties and the need to ensure stable and safe environments for children. *See In re Custody of Smith*, 137 Wn.2d 1, 13-14, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion). We find that the trial court erred by finding adequate cause on the third party custody petition and dismissing Mr. Holt's de facto parentage petition. Mr. Holt's allegations about Ms. Holt's behavior, if proved, would not meet the high burden of showing that Ms. Holt is unfit or that her continued custody of B.M.H. would result in actual detriment to his growth and development.

But Mr. Holt is entitled to an adjudication of whether he is B.M.H.'s de facto parent. Legal parent-child relationships arise in various ways under Washington law, including biology, presumptions of parentage (chapter 26.26 RCW), and adoption (chapter 26.33 RCW). We hold that the fact that Mr. Holt was once B.M.H.'s stepfather is not an automatic bar to establishing de facto parentage. We found the specific factual scenario in *M.F.* was contemplated by the legislature and addressed in the third party custody statute, but we cannot say the same of the circumstances here, where Mr. Holt alleges he formed a parent-child relationship with the consent of all

existing parents after entering B.M.H.'s life at birth following the death of B.M.H.'s biological father. Because there is no statutory avenue for Mr. Holt to petition for parentage, the de facto parentage doctrine fills this statutory void and provides for adjudication of whether Mr. Holt has undertaken a permanent role as B.M.H.'s parent.

1. Adequate Cause on Third Party Custody Petition

Under chapter 26.10 RCW, a third party can petition for child custody, but the State cannot interfere with the liberty interest of parents in the custody of their children unless a parent is unfit or custody with a parent would result in "actual detriment to the child's growth and development." *In re Custody of E.A.T.W.*, 168 Wn.2d 335, 338, 227 P.3d 1284 (2010); *In re Custody of Shields*, 157 Wn.2d 126, 142-43, 136 P.3d 117 (2006). The law's concept of the family rests in part on a presumption that "natural bonds of affection lead parents to act in the best interests of their children," *Parham v. J.R.*, 442 U.S. 584, 602, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979) (citing 1 WILLIAM BLACKSTONE, COMMENTARIES *447), and only under "'extraordinary circumstances'" does there exist a compelling state interest that justifies interference with the integrity of the family and with parental rights. *Shields*, 157 Wn.2d at 145 (quoting *In re Marriage of Allen*, 28 Wn. App. 637, 649, 626 P.2d 16 (1981)). To limit disruptions in family life, chapter 26.10 RCW places a high threshold burden on a petitioner seeking nonparental custody to allege specific facts that, if proved true, would meet this standard. *E.A.T.W.*, 168 Wn.2d at 338-39; RCW 26.10.032(1). If the court finds adequate cause for hearing on the petition, the burden

shifts to the respondent to show cause why the requested order should not be granted. RCW 26.10.032(2).

A parent is unfit if he or she cannot meet a child's basic needs, and in such cases, the State is justified in removing the child from the home and in certain cases, permanently terminating parental rights. RCW 26.44.010 (providing that in "instances of nonaccidental injury, neglect, death, sexual abuse and cruelty to children by their parents" and "where a child is deprived of his or her right to conditions of minimal nurture, health, and safety, the state is justified in emergency intervention based upon verified information"); *see also Shields*, 157 Wn.2d at 142-43.

Whether placement with a parent will result in actual detriment to a child's growth and development is a highly fact-specific inquiry, and "'[p]recisely what might [constitute actual detriment to] outweigh parental rights must be determined on a case-by-case basis.'" *Id.* at 143 (quoting *Allen*, 28 Wn. App. at 649). In *Shields*, we noted that when this heightened standard is properly applied, the requisite showing required by the nonparent is substantial and a nonparent will be able to meet this substantial standard in only "'extraordinary circumstances.'" *Id.* at 145 (quoting *Allen*, 28 Wn. App. at 649). The actual detriment standard has been met, for example, when a deaf child needed a caregiver who could effectively communicate with the child and the father was unable to do so, *see Allen*, 28 Wn. App. at 640-41, when a suicidal child required extensive therapy and stability at a level the parents could not provide, *see In re Custody of R.R.B.*, 108 Wn. App. 602, 31 P.3d 1212 (2001), and

when a child who had been physically and sexually abused required extensive therapy and stability at a level the parent could not provide, *see In re Custody of Stell*, 56 Wn. App. 356, 783 P.2d 615 (1989).

Facts that merely support a finding that nonparental custody is in the "best interests of the child" are insufficient to establish adequate cause. *In re Custody of S.C.D.-L.*, 170 Wn.2d 513, 516-17, 243 P.3d 918 (2010) (grandmother did not show adequate cause to proceed to trial because "the petition implies it would be in the child's best interest to reside with [grandmother], but the 'best interests of the child' standard does not apply to nonparent custody actions" (internal quotation marks omitted) (quoting *Shields*, 157 Wn.2d at 150)); *In re Custody of Anderson*, 77 Wn. App. 261, 266, 890 P.2d 525 (1995).

Mr. Holt does not allege that Ms. Holt is unfit. Rather, he alleges that neither biological parent is a suitable custodian because "the biological father of the child is deceased, having died before the birth of the child," and the "[mother] intends to immediately relocate the child to a situation that is unstable." CP at 3. Mr. Holt's petitions and declarations stated that since Ms. Holt's 2008 divorce she has "started relationships and moved several different men in and out of her home in Vancouver" and that "[t]hese relationships have been confusing and disruptive to [B.M.H.]." CP at 22. Mr. Holt stated that he believes "that [B.M.H.] is at risk if this pattern continues." CP at 24. According to Mr. Holt's declaration, "[B.M.H.] has expressed to [Mr. Holt] that he does not want to move to Castle Rock and he is missing his

11

brother and it's all just happening too quickly for him." *Id.* Mr. Holt's former wife stated in her declaration:

> I have observed over the years how Laurie jumps right into relationships head-on leaving very little time for the boys to adjust to the new man in her life. The constant shuffling of boyfriends in and out of the household I believe has taken its toll on both boys but especially on [B.M.H.] who sees Michael as his one and only father."

CP at 30. Ms. Holt's biological father stated in his declaration that "having watched the choices [Laurie] has made and the men come in and out of her life over the years, I feel strongly that the choices she is making now are detrimental to the boys." CP at 133.

Mr. Holt's petition and declarations also stated that B.M.H. viewed Mr. Holt as his father and the two had a close relationship; Ms. Holt was threatening to move B.M.H. out of the area and thus disrupt this close relationship; Ms. Holt had occasionally tried to limit Mr. Holt's contact with B.M.H. when she was involved in relationships with other men, including during her 2007-08 marriage; and Ms. Holt had once told Mr. Holt that he could not see B.M.H. CP at 19-20. The GAL emphasized that B.M.H. viewed Mr. Holt as a father and that it would be detrimental to B.M.H. if Ms. Holt terminated his contact with Mr. Holt. *Id.* The trial court found in its order that "it would cause actual detriment to the minor child's growth and development if the relationship between the minor child and the Petitioner is not protected" and that the trial court had "concerns that the mother may withhold visitation contact in the future." CP at 155.

Ms. Holt argues that the only harm found by the trial court was based on impermissible speculation that Ms. Holt *might* terminate contact between Mr. Holt and B.M.H. if she moved. Ms. Holt relies on *In re Dependency of T.L.G.*, 139 Wn. App. 1, 156 P.3d 222 (2007), where the Court of Appeals held that opinions based on a single incident that occurred five years earlier were not an adequate basis for finding that a limitation on visitation for a parent during dependency proceedings was necessary to "protect a child's health, safety, or welfare" under former RCW 13.34.136(1)(b)(ii) (2004). However, the facts alleged by Mr. Holt in his nonparental custody petition point to multiple instances of Ms. Holt limiting his contact with B.M.H. and to Ms. Holt's current decisions, rather than to a single incident in the distant past. Moreover, this court will, if necessary, speculate about future possibilities in making determinations about domestic relations. *See, e.g., In re Marriage of Katare*, 175 Wn.2d 23, 36-38, 283 P.3d 546 (2012), *cert. denied*, 133 S. Ct. 889 (2013). Concern about future action is not necessarily impermissibly speculative for findings of actual detriment.

But here, without more extraordinary facts bearing on B.M.H.'s welfare, the prerequisites for a nonparental custody action have not been met. The concern that Ms. Holt might interfere with Mr. Holt and B.M.H.'s relationship is insufficient to show actual detriment under *Shields* and to meet the burden of production for

13

adequate cause under *E.A.T.W.*[1] Although the importance of preserving fundamental psychological relationships and family units was part of the court's analysis in *Allen* and *Stell*, there were more extreme and unusual circumstances that contributed to the finding of actual detriment. In each case, the child had significant special needs that would not be met if the child were in the custody of the parent. Continuity of psychological relationships and family units was particularly important where a child had these special needs. Here, additional circumstances have not been alleged. This court has consistently held that the interests of parents yield to state interests only where "parental actions or decisions seriously conflict with the physical or mental health of the child." *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980) (citing *Parham*, 442 U.S. at 603). Other facts in the affidavits point to Ms. Holt's dating patterns and her decision to move to Castle Rock. These are not the kind of substantial and extraordinary circumstances that justify state intervention with parental rights. We reverse the Court of Appeals and dismiss the nonparental custody petition without prejudice.

---

[1] The Court of Appeals applied de novo review, and the parties do not challenge that standard. We recognize that we apply a more deferential standard of review to adequate cause determinations in somewhat related areas of law. *See, e.g., In re Parentage of Jannot*, 149 Wn.2d 123, 128, 65 P.3d 664 (2003). However, we need not answer today whether a more deferential standard of review is appropriate for our review of a trial court's adequate cause determination on a nonparental custody petition. *See Grieco v. Wilson*, 144 Wn. App. 865, 875, 184 P.3d 668 (2008) (citing *Jannot*, 149 Wn.2d at 127), *aff'd sub nom. E.A.T.W.*, 168 Wn.2d 335. Even under an abuse of discretion standard, our result would be the same.

2. De Facto Parentage

The Court of Appeals appropriately distinguished *M.F.* and reinstated Mr. Holt's de facto parentage petition. We are presented with a scenario that was not contemplated by the legislature and that merits an equitable remedy—where an individual forms a parent-child relationship after entering the child's life at birth following the death of the child's biological father but where the parents were married for less than two years. Because there is no statutory avenue for Mr. Holt to petition for parentage, the de facto parentage doctrine fills this gap and provides for meaningful adjudication of whether Mr. Holt has undertaken a permanent role as B.M.H.'s parent. The de facto parentage test protects Ms. Holt's constitutional rights by requiring that she consented to the parent-child relationship.

Whether a former stepparent may acquire de facto parent status over his or her former stepchild is a question of law that we review de novo. *See M.F.*, 168 Wn.2d at 531 (citing *King v. Snohomish County*, 146 Wn.2d 420, 423-24, 47 P.3d 563 (2002)).

De facto parentage is a flexible equitable remedy that complements legislative enactments where parent-child relationships arise in ways that are not contemplated in the statutory scheme. *See L.B.*, 155 Wn.2d at 701, 706. In *L.B.*, we identified a "statutory silence regarding the interests of children begotten by artificial insemination" and we granted equitable relief. *Id.* at 694 n.9. Two women who had lived together in a long-term relationship decided to have a child. One of the women conceived using donor sperm. *Id.* at 682. For six years, the women coparented the

15

child. *Id.* Some time after they separated, the biological mother terminated contact between her former partner and the child, and the former partner petitioned for recognition as the child's de facto parent. *Id.* at 684-85. Because there was no statutory means by which the former partner could establish her parental status, we adopted the de facto parentage doctrine established by the Wisconsin courts. *Id.* at 702-07 (citing *In re Custody of H.S.H.-K.*, 193 Wis. 2d 649, 533 N.W.2d 419 (1995)).

Establishing de facto parentage requires a showing that (1) the natural or legal parent consented to and fostered the parent-like relationship; (2) the petitioner and child lived together in the same household; (3) the petitioner assumed obligations of parenthood without expectation of financial compensation; and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature. *Id.* at 708. De facto parent status is "'limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life.'" 155 Wn.2d at 708 (quoting *C.E.W. v. D.E.W.*, 2004 ME 43, 845 A.2d 1146, 1152). The de facto parentage doctrine incorporates constitutionally required deference to parents by requiring that the biological or legal parent consent to and foster the parent-like relationship. Once a petitioner has made the threshold showing that the natural or legal parent consented to and fostered the parent-like relationship, the State is no longer "interfering on behalf of a third party in an insular family unit but is enforcing

the rights and obligations of parenthood that attach to de facto parents." *Id.* at 712. Under the test, attaining de facto parent status is "no easy task." *Id.*

De facto parentage remains a viable equitable doctrine under Washington law. We respectfully disagree with the dissent's suggestion to the contrary. Since *L.B.*, legislative amendments have "clarif[ied] and expand[ed] the rights and obligations of state registered domestic partners and other couples related to parentage" but have not abrogated the common law doctrine of de facto parentage. ENGROSSED SECOND SUBSTITUTE H.B. 1267, at 1, 68th Leg., Reg. Sess. (Wash. 2011). "It is a well-established principle of statutory construction that '[t]he common law . . . ought not to be deemed repealed, unless the language of a statute be clear and explicit for this purpose.'" *Potter v. Wash. State Patrol*, 165 Wn.2d 67, 77, 196 P.3d 691 (2008) (alteration in original) (internal quotation marks omitted) (quoting *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va.*, 464 U.S. 30, 35-36, 104 S. Ct. 304, 78 L. Ed. 2d 29 (1983)); *L.B.*, 155 Wn.2d at 695 n.11 ("'It must not be presumed that the legislature intended to make any innovation to the common law without clearly manifesting such intent.'" (quoting *Green Mountain Sch. Dist. No. 103 v. Durkee*, 56 Wn.2d 154, 161, 351 P.2d 525 (1960))). No such intent appears here. To the contrary, where the act formerly "govern[ed] every determination of parentage in this state," LAWS OF 2002, ch. 302, § 103 (codified as RCW 26.26.021(1)), it now simply "applies to determinations of parentage" and "does not create, enlarge, or diminish parental rights or duties under other law of this state,

17

LAWS OF 2011, ch. 283, § 2(1),(3) (codified as RCW 26.26.021). In *L.B.*, we chronicled the long standing history of Washington courts exercising equity powers "in spite of legislative enactments that may have spoken to [an] area of law, but did so incompletely," and we determined that our state's relevant statutes do not provide the exclusive means of obtaining parental rights and responsibilities. 155 Wn.2d at 689. That pronouncement stands as true today as it was then. Notwithstanding the 2011 amendments to the Uniform Parentage Act of 2002 (UPA), chapter 26.26 RCW, it is "inevitabl[e] [that] in the field of familial relations, factual scenarios arise, which even after a strict statutory analysis remain unresolved, leaving deserving parties without any appropriate remedy, often where demonstrated public policy is in favor of redress." *Id.* at 687. Where the legislature remains silent with respect to determinations of parentage because it cannot anticipate every way that a parent-child relationship forms, we will continue to invoke our common law responsibility to "respond to the needs of children and families in the face of changing realities." *Id.* at 689. We cannot say that legislative pronouncements on this subject preclude any redress to Mr. Holt or B.M.H., and it is our duty to apply the common law in a manner "consistent with our laws and stated legislative policy." *Id.* at 707.[2]

---

[2] The UPA was amended in 2011 to specifically reference state-registered domestic partnerships in various provisions and to specify that the UPA applies to persons of the same sex who have children together to the same extent it applies to opposite sex couples who have children together. FINAL B. REP. on Engrossed Second Substitute H.B. 1267, 68th Leg., Reg. Sess. (Wash. 2011). Gender-specific terms in the act were replaced with gender-neutral terms. *Id.* Additionally, a new provision for the presumption of parentage was adopted. Now, a party is "presumed to be the parent of a child if, for the first two years of the child's life, the person

18

Ms. Holt also argues that if de facto parentage remains a viable doctrine, our case law precludes a stepparent from becoming a de facto parent. In *M.F.*, we held that a former stepfather could not be his stepdaughter's de facto parent, but we did not preclude all stepparents as a class from being de facto parents. To do so would be contrary to legislative directive that children not be treated differently based on the marital status of their parents. *See* RCW 26.26.106;[3] RCW 26.18.030. Side by side, this case and *M.F.* illustrate that there is no single formula for all stepparents. M.F.'s biological parents separated shortly after her birth and shared parenting rights and responsibilities under a parenting plan. We found that the specific factual scenario in that case was contemplated by the legislature and addressed in chapter 26.10 RCW and that applying the equitable remedy would "infringe[] upon the rights and duties of M.F.'s existing parents." *M.F.*, 168 Wn.2d at 532. But arbitrary categorical distinctions based on a petitioner's status as a stepparent or former stepparent would preclude many legitimate parent-child relationships from being recognized. Here, where it is alleged that an individual entered a child's life at birth following the death of that child's second biological parent, and undertook an unequivocal and permanent parental role with the consent of all existing parents but does not have a statutorily

---

resided in the same household with the child and openly held out the child as his or her own." RCW 26.26.116(2) (as amended by LAWS OF 2011, ch. 283, § 8).

[3] "A child born to parents who are not married to each other or in a domestic partnership with each other has the same rights under the law as a child born to parents who are married to each other or who are in a domestic partnership with each other." RCW 26.26.106.

protected relationship, justice prompts us to apply the de facto parent test. This adequately balances the rights of biological parents, children, and other parties.

Ms. Holt contends that as a former stepparent, Mr. Holt has a sufficient statutory remedy because he can file a nonparental custody petition under chapter 26.10 RCW. Suppl. Br. of Pet'r at 5-6. But that remedy was available in *L.B.* as well. Precluding *any* individual from petitioning for de facto parentage because he or she can file for nonparental custody would obliterate the de facto parentage doctrine because *any* person not recognized as a parent may seek nonparental custody. *See* RCW 26.10.030. As the Court of Appeals noted, the former partner in *L.B.* had the ability to file a nonparental custody petition, yet we did not find this fatal to her claim. *See B.M.H.*, 165 Wn. App. at 378 n.13. Like the former partner in *L.B.*, Mr. Holt has no meaningful statutory means by which he can seek a determination of parentage, and nonparental custody is an inadequate remedy to protect his weighty interests relative to the child and its biological parent. By requiring proof that Ms. Holt fostered the parent-child relationship, the de facto parentage doctrine will properly balance Mr. Holt's interests in an adjudication of parentage against the deference we give natural parents. We affirm the Court of Appeals and remand to the trial court for further proceedings on Mr. Holt's de facto parent petition.[4]

---

[4] We granted leave to submit amicus briefs to the American Civil Liberties Union of Washington, the Center for Children & Youth Justice, and Legal Voice, and passed the petitioner's objection to the merits. After consideration, we hew to our decision to grant leave.

3. Attorney Fees

Ms. Holt and Mr. Holt each request attorney fees under RCW 26.10.080, which provides that "the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs." Balancing the parties' respective need and ability to pay, we decline to award fees. *See In re Custody of Brown*, 153 Wn.2d 646, 656, 105 P.3d 991 (2005).

## IV. CONCLUSION

When a parent is otherwise fit, a third party has a high burden under chapter 26.10 RCW to show extraordinary circumstances that justify interference with a parent's constitutional rights. The facts presented by Mr. Holt do not satisfy that burden, and we reverse the Court of Appeals on this issue. But like the former partner in *L.B.*, Mr. Holt alleges that he, Ms. Holt, and B.M.H. have formed a family in a manner that was not contemplated by the legislature and he has no statutory means by which he can seek a determination of parentage. The de facto parentage doctrine properly balances his interests in an adjudication of parentage against the deference we give biological parents, and we affirm the Court of Appeals on this issue and remand to the trial court for further proceedings consistent with this opinion.

González, J.

WE CONCUR:

Stephens, J.

Owens, J.

Fairhurst, J.

Chambers, JPT

*In re Custody of B.M.H.*

No. 86895-6

MADSEN, C.J. (concurring/dissenting)—The majority concludes that a stepparent can seek custody of a child as a de facto parent. I disagree. First, when a parent marries, the parent is highly likely to encourage her spouse, the stepparent, in pursuit of a harmonious family life that includes a loving relationship with her child together with shared responsibilities of child-rearing. This encouragement does not mean that the parent consents to a permanent, life-long parent-child relationship between her child and the stepparent if the marriage should end. And, as this court has previously noted, the de facto parent test is too easily met in the stepparent-child setting. Facts that lend themselves to an inference of consent to a parent-child relationship are indistinguishable from facts that show the parent wants the marriage to prevail and a family unit to be formed. When the marriage ends, the inference is no longer justifiable.

Much more importantly, the majority impermissibly overrides a parent's fundamental constitutional rights to the care, custody, and control of her child. Interference with a fit parent's parenting decision to maintain custody of her child is permissible only if the stepparent makes a substantial showing that placement with the fit

parent would result in actual detriment to the child's growth and development. Our cases and those of the Court of Appeals demand this proof when a stepparent seeks custody of a child because the stepparent is a nonparent. There is nothing about the stepparent setting that shows a lesser standard meets constitutional requirements and our cases are clearly to the contrary.

The majority's relaxed standard for removing custody decision-making from the parent will disproportionately impact women, and statistically many of these women will live in poverty with limited resources to oppose legal actions for custody.[1] The majority approval of de facto parent claims will also support custody actions by unmarried, former cohabitating partners of a parent because the same analysis that the majority applies in the stepparent context will as readily apply to the unmarried partner who for a time shares family life with the parent.

Finally, the statutes that apply to this case are the third party custody statutes in chapter 26.10 RCW. The majority and Justice Wiggins in his dissent-in-part discuss other recent legislative enactments, reaching different conclusions about their meaning and effect. They would be better advised to address these recent statutes when their application is squarely presented.

---

[1] In 2009, the poverty rate for custodial mothers was 30.4 percent. TIMOTHY S. GRALL, U.S. CENSUS BUREAU, CONSUMER INCOME REPORT NO. P60-240, CUSTODIAL MOTHERS AND FATHERS AND THEIR CHILD SUPPORT: 2009, at 5 (2011), *available at* http://www.census.gov/prod/2011pubs/p60-240.pdf. In 2012, about 30 percent of families with a female householder lived in poverty. CARMEN DENAVAS-WALT, BERNADETTE D. PROCTOR, & JESSICA C. SMITH, U.S. CENSUS BUREAU, CONSUMER INCOME REPORT NO. P60-245, INCOME, POVERTY, AND HEALTH INSURANCE COVERAGE IN THE UNITED STATES: 2012, at 17 (2013), *available at* http://www.census.gov/prod/2013pubs/p60-245.pdf.

Discussion

In *In re Marriage of M.F.*, 168 Wn.2d 528, 228 P.3d 1270 (2010), we held that the common law de facto parent theory does not apply in the stepparent-stepchild context. The majority says, however, that here, unlike in *M.F.*, a statutory "gap" exists that prevents Michael Holt (Michael) from petitioning for parentage. Majority at 15.

We concluded in *M.F.* that the stepparent could seek legal custody of the stepchild under the third party custody statutes and therefore there was no need to recognize a common law theory. *M.F.*, 168 Wn.2d at 532-33. Our holding was not limited to the facts, however. Indeed, development of the third party custody statutes has proceeded hand-in-hand with custodial actions brought by stepparents, as recognized in *M.F.*, and no "gap" exists. *See id.* As we explained in *M.F.*, in *In re Marriage of Allen*, 28 Wn. App. 637, 645, 626 P.2d 16 (1981), the trial court had awarded custody of the child to a nonparent, the stepmother, in the "best interests of the child." Unlike the child's father, the stepmother was fluent in sign language and heavily involved in the special educational environment necessary for the growth and development of the child, who was deaf and needed a special environment at home. *Id.* at 640-42.

The Court of Appeals upheld the custody determination but rejected the "best interests of the child" standard as being applicable only in actions between parents under existing custody provisions in former chapter 26.09 RCW, modeled on the Uniform Marriage and Divorce Act. The Court of Appeals instead upheld the custody decision after determining that the parent's constitutional rights were outweighed because actual

3

detriment to the child would result from placement with the fit father, who could not effectively communicate with the child. *Id.* at 641, 649.

The legislature subsequently approved *Allen*'s heightened standard of proof. In 1987, the legislature enacted third party custody statutes separate from the statutory scheme that applies as between the parents. The third party custody statutes were explicitly intended to reenact and continue the existing law that applied to actions involving third party custody of children to distinguish this body of law from the custody provisions of chapter 26.09 RCW. *See In re Custody of Stell*, 56 Wn. App. 356, 364-65, 783 P.2d 615 (1989) (discussing this history); RCW 26.10.010.

Although one of the third party custody statutes that was enacted, RCW 26.10.100, then stated and continues to state that custody will be determined in the "best interests of the child," in actions involving a nonparent the actual detriment requirement must be met to permit interference with a fit parent's child-rearing decisions. This is because of the legislature's express continuation of the existing law pertaining to third parties and because of the parent's constitutional rights. The analysis from *Allen* continues to apply if the child is in the custody of a *parent* and a stepparent/third party seeks custody, i.e., the heightened constitutionally mandated standard controls as explained in *Allen* and its progeny. This is part and parcel of the body of third party custody law that the legislature reenacted and continued in 1987. As in *Allen*, the Court of Appeals in *Stell* concluded that in a custody proceeding involving a parent and a nonparent, the nonparent is required

4

to show that the child's parents are unfit or that placing the child with them would be actually detrimental to the child's growth and development. *Stell*, 56 Wn. App. at 365.

In 2006, we decided *In re Custody of Shields*, 157 Wn.2d 126, 136 P.3d 117 (2006). *Shields*, like *Allen*, involved a stepparent seeking custody after marriage to the child's parent ended.

We expressly recognized that a stepparent is a nonparent. *Id*. at 141 (observing that in *Allen* custody was awarded "to a nonparent, the stepmother"). We held:

> When applied properly . . . the actual detriment standard is constitutional. The State has a compelling interest in protecting children's welfare and the remedy is narrowly tailored to meet the State's interest. Under the heightened standard, a court can interfere only with a fit parent's parenting decision to maintain custody of his or her child if the nonparent demonstrates that placement of the child with the fit parent will result in actual detriment to the child's growth and development. . . .
> . . . [W]hen this heightened standard is properly applied, the requisite showing required by the nonparent is "substantial" . . . and a nonparent will generally be able to meet this test in only "extraordinary circumstances."

*Id*. at 144-45 (citations omitted).

Thus, we determined in *Shields* that a stepparent was a nonparent subject to provisions in chapter 26.10 RCW and to the heightened constitutional standard that must be applied when the custody issue is between a parent and a nonparent.

Then, when we were asked to decide that a stepparent was a de facto parent in *M.F.*, we recounted this history and said that in *Shields*, where the action was brought by a stepparent, "we confirmed that under chapter 26.10 RCW[, the third party custody scheme,] a third party may be granted custody" only when the third party demonstrates

"that placement of the child with the fit parent will result in actual detriment to the child's growth and development." *M.F.*, 168 Wn.2d at 533; *Shields*, 157 Wn.2d at 144.

Thus, our state decisional and statutory law has heretofore provided that a stepparent is a nonparent third party for purposes of custody actions. The legislature has confirmed that the third party custody statutes and associated existing body of law applies to stepparents. Under this continued body of law, stepparents, as third parties must show either that the parent is unfit or that placement of the child with the parent is actually detrimental to the child's growth and development before the parent's constitutional rights to the care, custody, and control of the child may be invaded.

The majority fails to adhere to our precedent, fails to defer to the legislature's express intent when enacting the third party custody statutes, and fails to protect a parent's constitutional rights.

The majority says, however, that the facts here are unlike those in *M.F.* and they support the conclusion that no statutory avenue for seeking custody exists, unlike in *M.F.* In every case facts will vary. This is not a reason to say a statutory gap exists. More importantly, the legislature's reenactment and continuation of existing law after *Allen* provided an accessible "avenue . . . for a stepparent seeking a legal, custodial relationship with a child. The legislature has created and refined a statutory scheme by which a stepparent may obtain custody of a stepchild." *M.F.*, 168 Wn.2d at 532.

Finally, it bears noting that the facts relied on in the majority to show that no statutory remedy exists are the kind of facts that would be significant if the de facto

6

parent theory applied. *See* majority at 15. However, in *M.F.* we refused to even consider whether the stepparent could show factually that the prongs of the de facto parent test were met. It made no difference whether the stepparent could meet the test because the de facto parent test could not be applied at all. We said, "[T]he correct starting point is not whether the de facto parent test has been met. The factors outlined in *L.B.* are relevant only if this court first decides that the de facto parentage doctrine applies to the circumstances presented in this case." *M.F.*, 168 Wn.2d at 534.

*M.F.* dictates that a stepparent is not entitled to bring a custody action under a de facto parent theory, and this result is necessarily follows from *Allen* and *Shields*.

The sole recourse for Michael is a third party custody action under chapter 26.10 RCW, and he in fact brings a petition under this chapter. The majority correctly holds that he has failed to show that Laurie Holt (Laurie) is unfit or that placement of her child with her results in actual detriment to the child's growth and development.

Once the majority has decided, as it does, that Michael's petition under the third party custody statutes cannot proceed, it should end the analysis. But the majority does not stop there. It proceeds with its impermissible de facto parent theory, notwithstanding its conclusion that Michael has not made the required substantial showing sufficient to justify impairment of Laurie's fundamental constitutional rights in the care, custody, and control of her son.

The majority's approach is impermissible because it allows a stepparent to seek custody in violation of a parent's fundamental constitutional rights in her child.

The majority believes, though, that the consent prong of the de facto parent test protects the parent's constitutional rights. As we pointed out in *M.F.*, the de facto parent test would be too-easily applied in the stepparent context, is ill-suited to the custody issue, and makes no meaningful distinctions in this context. *Id.* We said about the consent prong: "in the vast majority of cases a parent will encourage his or her spouse, the stepparent, to act like a parent in relationship to the child." *Id.* at 535. Our concern is echoed by one noted author, who says in connection with the American Law Institute's treatment of de facto parents and its test that similarly includes consent:

> Because agreement may be implied, this [part of the test] is satisfied when a mother acquiesces to the partner's behavior—behavior that virtually any mother would welcome in her partner, such as taking the child to the doctor, reading to the child, helping the child get ready for bed, and making dinner for the family.

Robin Fretwell Wilson, *Trusting Mothers: A Critique of The American Law Institute's Treatment of De Facto Parents*, 38 HOFSTRA L. REV. 1103, 1112 (2010).

Accordingly, satisfying the consent prong is meaningless in the stepparent context. Consent to coparent within the marriage and family unit is not the same as consent to a life-long, parent-child relationship on the part of the stepparent to continue no matter what happens to the marriage. Yet consent is precisely the hook upon which the majority hangs its catch.

The other prongs are not particularly probative in the stepparent context, either. We said in *M.H.*:

> [T]he second factor will nearly always be met—that "the petitioner and the child lived together in the same household." [*In re Parentage of*] *L.B.*, 155

8

> Wn.2d [679,] 708, 122 P.3d 161 [(2005)]. The third element is that the petitioner assumed obligations of parenthood without expectation of compensation, and one only has to envision the stepparent attending school functions, helping the child get dressed in the morning, or engaging in the other numerous events that together make up family life with a child to see how easily this factor might be satisfied. The only variable in most cases, it would appear, is the length of time the stepparent has been in a parental role, and generally this would be merely a matter of how long the relationship with the parent endures—hardly a basis for deciding parental status.

*M.H.*, 168 Wn.2d at 535.

The majority's attempt to distinguish *M.F.* is patently inconsistent with the analysis in it. In *M.F.*, we explained both why the third party custody statutes apply to stepparents and why the de facto test must not. As we observed in *M.F.*, *Allen* was the existing law at the time the legislature reenacted and continued the existing law regarding third party custody actions, and *M.F.*, *Allen*, and *Shields* require stepparents to make the heightened constitutional showing of unfitness or detriment to obtain custody.[2]

Finally, I note that in *M.F.* there were two fit parents. This, of course, cannot be a viable distinction because our statutory and constitutional law plainly contemplates and protects the single parent just as it does two parents. A single parent's constitutional rights in her child must be safeguarded every bit as vigorously as the constitutional rights of two parents together.

---

[2] We recently reiterated that under the third party custody statutes a custody order may be granted to a nonparent only if the court finds that the parent is unfit or that placement with the parent would result in actual detriment to the child's growth and development. *In re Custody of E.A.T.W.*, 168 Wn.2d 335, 334, 227 P.3d 1284 (2010). This standard is necessary to carry out the constitutionally based requirement of according deference to parents in parent-nonparent custody disputes. *Id.*

9

The majority also believes that the present case is analogous to *L.B.*, and that just as the third party custody statutes were available to the same-sex nonbiological parent in *L.B.*, the de facto parent theory is applicable here.

*L.B.* is not like the present case. In *L.B.*, the same sex partners could not marry, nor were rights equal to those of heterosexual parents recognized under state statutes at the time. The two parties had been in a long-term committed relationship and did everything they could do to create a child together. They could not marry and could not together conceive their child, unlike heterosexual partners, but they deliberately set out to and did initiate the pregnancy together and both before and after the child's birth acted in every way as the child's parents.

In *L.B.*, the de facto test was a necessary legal channel for attributing to the two partners the parenthood that they already shared. Because of the nature of the parties' relationship—as a same-sex couple—the parent who was not a biological parent could otherwise be cut off from parental rights under the heightened showing that applies when a nonparent seeks custody. The de facto status gave legal effect to a person who was and always had been the child's parent. No acquired parenthood was ever at issue. Recognizing this, this court applied the de facto parent theory that enabled the nonbiological parent to seek custody under the "best interests of the child" standard applicable between parents.

The circumstances in a stepparent context are not the same. Parentage exists in the two biological parents who created the child and brought into existence the parent-

child relationship. Here, Laurie's child was created by her and her fiancé, who passed away before the child was born.

Without doubt, a stepparent may enter the picture and assume a role as a loving, caring parental figure. Our laws permit a stepparent to seek custody of a child under the third party custody statutes. Adoption is also a possibility. But a parent's constitutional rights must be given precedence over the stepparent and it takes a very strong showing to overcome a fit parent's rights. As we held in *In re Custody of Smith*, 137 Wn.2d 1, 20, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion), a fit parent is presumed to act in the child's best interest and there must be a showing of harm to the child to overcome this presumption.[3]

The majority's decision that de facto parent status is available to a stepparent means that the stepparent is a parent in every respect. *L.B.*, 155 Wn.2d at 710 ("we hold that our common law recognizes the status of *de facto* parents and places them in parity with biological and adoptive parents in our state"). This means that the stepparent will be able to proceed under the "best interests of the child" standard that applies under chapter 26.09 RCW when two parents dispute custody of their child, an easier showing that places the parent's and the stepparent's interests on a par.

This result is in tension with the common law view of stepparents and their obligations to their spouses' children. One author points out how the concept of parenthood traditionally related to the duties a stepparent has toward such children,

---

[3] In *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 109 P.3d 405 (2005), we confirmed that this holding in *Smith* was not affected by the decision in *Troxel*.

saying that stepparents generally have had a recognized relationship with the child of his or her spouse but no continuing duties if the marriage ends. June Carbone, *The Legal Definition of Parenthood: Uncertainty at the Core of Family Identity*, 65 LA. L. REV. 1295, 1311-12 (2005). "The stepparents' responsibilities . . . are not permanent" but rather "may be relinquished at will." *Id.* at 1312. Absent adoption, stepparents have not been viewed as having a permanent bond with the child, both because any obligation to the child is derivative of the obligation to the legal parent and because, if marriage to a legal parent triggered permanent support obligations to the child, it would discourage remarriage. *Id.* at 1312-13.

Under our state law "[t]he obligation to support stepchildren shall cease upon the entry of a decree of dissolution, decree of legal separation, or death." RCW 26.16.205. Thus, once the marriage ended without Michael having adopted the child, Laurie was unable to compel Michael to pay support. The statute supports the view that Michael is only in a parent-like relationship because of his marriage to Laurie and any rights and responsibilities vis-à-vis Laurie's child are derivative of that relationship. Once the relationship ends, so do these rights and responsibilities. He becomes a third party to the children when the marriage ends. Laurie cannot compel him to provide child support, a conclusion consistent with the derivative nature of his obligations.

However, if he were to obtain de facto parent status, he would have the rights and obligations of a parent, as we said in *L.B.* His relationship to the child would become primary and permanent, and he could seek custody under a "best interests of the child"

12

standard. If he did not seek de facto parent status, however, Laurie herself cannot compel him to or make the argument herself, nor can she seek support for the child. This one-sided paradigm is fundamentally at odds with the constitutional rights she has in her child. Why should a stepparent be entitled to seek de facto parent status and then custody under the lower "best interests of the child" standard when, once the marriage ends, the parent has no ability to seek either a permanent relationship for her children with the stepparent or support for the children.

The majority poses a threat to parents' constitutional rights that may be far-reaching because of the sheer number of stepparents and stepchildren potentially affected, the fact that the majority's analysis applies equally well to cohabitating partners of parents, and because the majority appears inclined to find statutory "gaps" that must be filled based solely on different factual circumstances, notwithstanding recent legislation.

An estimated 25 percent of children today will become part of a family including a stepparent. Sarah H. Ramsey, *Constructing Parenthood For Stepparents: Parents By Estoppel and De Facto Parents Under the American Law Institute's Principles of the Law of Family Dissolution*, 8 DUKE J. GENDER & POL'Y 285, 287 (2001) (quoting Frank F. Furstenberg, Jr., *History and Current Status of Divorce in the United States*, 4 FUTURE OF CHILDREN, Spring 1994, at 29, 35[4]). Moreover, a large number of children live with one parent, and predictably in a number of these cases there will be a stepparent who is no longer married to the parent. Some "21 million children . . . lived with one

---

[4] *Available at* http://www.futureofchildren.org/futureofchildren/publications/docs/04_01_02.pdf.

parent in 2012." JONATHAN VESPA, JAMIE M. LEWIS, AND ROSE M. KREIDER, U.S. CENSUS BUREAU, POPULATION CHARACTERISTICS REPORT NO. P20-570, AMERICA'S FAMILIES AND LIVING ARRANGEMENTS: 2012, at 23 (2013).[5] "[A]pproximately 1 in 5 White, non-Hispanic children (21 percent); 1 in 3 Hispanic children (31 percent); and 1 in 2 Black children (55 percent) lived with one parent" in 2012. *Id.* at 23-26. The vast majority of family groups with one parent are mother-only groups. *Id.* at 13.[6]

Nearly identical statistics reflect 2010 living arrangements involving custody of children. In 2010, about 13.7 million parents had custody of 22 million children under 21 years of age while the other parent lived elsewhere. TIMOTHY S. GRALL, U.S. CENSUS BUREAU, CONSUMER INCOME REPORT NO. P60-240, CUSTODIAL MOTHERS AND FATHERS AND THEIR CHILD SUPPORT: 2009, at 2 (2011).[7] The majority of custodial parents were mothers (82.2 percent). *Id.*

Census information also shows that cohabitation continues as a growing trend. In 2012, "more cohabiting adults lived with children who were not biologically related to them than did married spouses." VESPA, LEWIS & KREIDER, *supra*, at 21. When such couples separate, the nonparent can readily argue that the majority's decision and analysis in this case support a de facto parent theory in the cohabitation context.

One author has describes such potential for broad application of the de facto parent theory as "a thinned-out conception of parenthood" that is "primarily a function of

---

[5] *Available at* http://www.census.gov/prod/2013pubs/p20-570.pdf.
[6] These statistics for 2012 generally involve children under 18 years of age. VESPA, LEWIS & KREIDER, *supra*, at 2.
[7] *Available at* http://www.census.gov/prod/2011pubs/p60-240.pdf.

co-residence" and that "would give former live-in partners access to a child" even when opposed by the legal parent, "nearly always a child's mother." Wilson, *supra*, at 1109. "Mothers are disproportionately affected by the extension of new parental rights to live-in partners because most non-marital children and children of divorce live with their mothers." *Id.* at 1109-10.

In short, the parents who are most likely to be affected by the majority's decision are mothers who will often be members of a minority race or group. Many women faced with custody disputes will have resources so limited that they are highly unlikely to be able to afford to hire legal assistance in private custody disputes. *Cf. King v. King*, 162 Wn.2d 378, 174 P.2d 659 (2007) (dissolution proceeding where residential placement of children at issue; no right to appointed counsel at public expense); *id.* at 418 (addressing negative impact on custody and closely related matters when indigent litigants lack counsel); *see generally* GRALL, *supra*, at 4, 5 (over one-quarter, 28.3 percent, of custodial parents had income below the poverty level in 2009; the poverty rate of custodial mothers was 30.4 percent).

In Washington, as these national statistics suggest, a significant number of parents may be subject to the majority's flawed analysis that can transform an ex-husband or ex-wife who acquires a stepparent relationship with the parent's child, or a former cohabitant, into a parent with all of the rights of a parent, including the right to seek child custody under a "best interests of the child" standard without regard to the parent's fundamental constitutional rights.

15

"Best interests of the child" alone provides a greater opportunity for placing a child where a court ultimately decides the child would be best off. But we have cautioned against just this kind of result. We said in *Smith* that to consider that any lesser standard than strict scrutiny can apply, such as "best interests of the child,"

> would be the logical equivalent to asserting that the state has the authority to break up stable families and redistribute its infant population to provide each child with the "best family." It is not within the province of the state to make significant decisions concerning the custody of children merely because it could make a "better" decision.

*Smith*, 137 Wn.2d at 20 The majority's analysis brings to pass the very danger we warned of in *Smith*. Regardless of how carefully couched, how plausibly stated, how well-intended, the end result is a judicial choice, applicable far beyond this case, that the child may be better off with the stepparent or even a former cohabitant. But the constitutional rights in the care, custody, and control of the child are here held by Laurie, not Michael and not anyone else, and "best interests of the child" is constitutionally inadequate.

We have heretofore adhered to an strict scrutiny analysis when a fit parent's right to autonomy in child-rearing decisions is at issue. We have done so to protect the fundamental liberty interest that parents have in the care and welfare of their minor children. *See In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980); *accord In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007); *Smith*, 137 Wn.2d at 15; *In re Welfare of Luscier*, 84 Wn.2d 135, 137, 524 P.2d 906 (1974). The right to raise one's children is deemed essential. *Meyer v. Nebraska*, 262 U.S. 390, 399,

16

401, 43 S. Ct. 625, 67 L. Ed. 1042 (1923). "The liberty interest . . . of parents in the care, custody, and control of their children [ ] is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." *Troxel*, 530 U.S. at 65 (plurality opinion). The Court has "recognized on numerous occasions that the relationship between parent and child is constitutionally protected." *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978). A "mother['s] . . . right to the care, custody, management and companionship of her minor children" are rights "more precious" to her "than property rights." *May v. Anderson*, 345 U.S. 528, 533, 73 S. Ct. 840, 97 L. Ed. 1221 (1953). "It is cardinal with [the Court] that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944).

We must presume that a fit parent acts in the best interests of her child. *In re Welfare of C.S.*, 168 Wn.2d 51, 55, 225 P.3d 953 (2010); *Troxel*, 530 U.S. at 68, 69 (plurality opinion). "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 99 S. Ct. 2493, 61 L. Ed 2d 101 (1979).

The majority excuses its constitutional violations by an analysis that can turn Michael into a parent, allowing him to proceed under the "best interests of the child"

17

standard. Although he is not the child's natural, biological, or adoptive parent, as a de facto parent he can proceed without regard to Laurie's fitness as a parent and without having to show detriment to the child because Laurie's rights are no longer superior to his.

I do not ascribe to the majority's loosely reframed de facto parent standard for stepparents. Our cases are to the contrary, and the fundamental rights a parent has in the care, custody, and control of her child are too precious to cast aside as no longer of any moment. There is no "gap" in our statutory scheme that demands recognition of this common law theory in the stepparent context, and the de facto parent test itself is a low hurdle over a parent's constitutional rights.

As Justice Wiggins urges in his dissent-in-part, we should require a much clearer relinquishment of constitutional rights than from facts showing that Laurie encouraged Michael to form a relationship with her child. Agreement to a close relationship and shared child-rearing responsibilities and rewards within the marriage is not equivalent to a life-long parent-child relationship, and is insufficient to show that Laurie has given up her fundamental rights.

Finally, I comment briefly on the conclusions drawn by the majority and the dissent-in-part about recent changes in statutes addressing parents. In my view, it would be better to address the new enactments in cases where they are at issue. However, without further comment, I do go so far as to say that I believe the legislature has closed the statutory gap we identified in *L.B.*

Conclusion

I dissent from the majority opinion because the de facto parent theory should not be applied in the stepparent context. I agree with the majority, however, that Michael Holt has failed to make a sufficient showing that Laurie Holt is unfit or that placement of her child with her would actually result in detriment to the child's growth and development. Accordingly, his petition for custody of the child must be rejected.

No. 86895-6
Madsen, C.J. (concurring/dissenting)

_Madsen, C.J._

No. 86895-6

WIGGINS, J. (dissenting in part[1])—When this court provided a de facto parentage remedy in *In re Parentage of L.B.*, 155 Wn.2d 679, 122 P.3d 161 (2005), we were filling a statutory gap that made it difficult for a woman to become the legal parent of her same-sex partner's biological child. In 2009, the legislature filled this gap by creating parity between state registered domestic partners and married spouses in all respects, including parentage. Because the legislature filled the statutory gap at issue in *L.B.*, the need for a de facto parentage doctrine no longer exists. Despite the fact that the 2009 domestic partnership amendments fully resolved the concern we addressed in *L.B.*, the majority feels that its role is to legislate by finding additional—albeit imaginary—gaps in the legislative scheme and purporting to fill them.

Equally troubling is where the majority's decision leaves us in light of significant 2011 amendments to the Uniform Parentage Act of 2002 (UPA), chapter 26.26 RCW. These amendments essentially codify the de facto parentage doctrine, signaling the legislature's intent to provide a comprehensive statutory—rather than judge-made—framework to determine the circumstances under which the parent-

---

[1] I concur with the majority's resolution of Michael Holt's third party custody claim under chapter 26.10 RCW, *see* majority at 9-14, and do not address it further.

child relationship is formed in Washington. These amendments do not apply to this case but will apply to all parentage claims brought after July 22, 2011. *See* LAWS OF 2011, ch. 283, § 58 (effective July 22, 2011). Thus, rather than expand a common law doctrine that the legislature has made doubly obsolete, this court should acknowledge, as we did in *L.B.*, that it is the province of the legislature, not this court, to provide the laws and policies that control the legal relationships among parents, children, and families. I dissent.

## DISCUSSION

I.  The statutory gap addressed in *L.B.* no longer exists

This court adopted the de facto parentage doctrine to address a very specific statutory deficiency: the respondent in *L.B.* acted as a parent in every way but could not be L.B.'s legal parent because she was in a same-sex relationship with L.B.'s biological mother. *L.B.*, 155 Wn.2d at 684, 707-08. As we pointed out in *L.B.*, "Our legislature has been conspicuously silent when it comes to the rights of children like L.B., who are born into nontraditional families, including any interests they may have in maintaining their relationships with the members of the family unit in which they are raised." *Id.* at 694. We adopted the de facto parentage doctrine to "fill the interstices that our current legislative enactment fails to cover." *Id.* at 707. However, we also acknowledged that "the legislature may eventually choose to enact differing standards than those recognized here today, and to do so would be within its province." *Id.* Thus, although we filled a void in the UPA to address a specific shortcoming in the statutory scheme, we plainly recognized that the legislature could revise the manner in which the parent-child relationship is formed in Washington.

2

In 2009, the legislature did just that, filling the legislative void we addressed in *L.B.* by granting state registered domestic partners all of the privileges and rights of married spouses. The legislature had created domestic partnerships in 2007, which it defined as relationships in which two persons share a common residence, RCW 26.60.030(1); are at least 18 years of age, RCW 26.60.030(2); and "both persons are members of the same sex" or "at least one of the persons is sixty-two years of age or older," RCW 26.60.030(6). In 2009, the legislature declared, "It is the intent of the legislature that for all purposes under state law, state registered domestic partners shall be treated the same as married spouses." LAWS OF 2009, ch. 521, § 1 (codified at RCW 26.60.015). This 2009 domestic partnership enactment was then submitted to the people in Referendum Measure 71, which was placed on the ballot and approved by voters at the November 3, 2009 general election. *See* WASH. SEC'Y OF STATE, NOVEMBER 03, 2009 GENERAL ELECTION RESULTS: REFERENDUM MEASURE 71 CONCERNING RIGHTS AND RESPONSIBILITIES OF STATE-REGISTERED DOMESTIC PARTNERS, http://www.vote.wa.gov/results/20091103/Referendum-Measure-71-concerning-rights-and-responsibilities-of-state-registered-domestic-partners.html (last visited Nov. 22, 2013).

After the adoption of the 2009 enactment granting parity between domestic partners and married spouses, same-sex couples no longer fell into a statutory gap with regard to parentage because if they registered as domestic partners, they were to be treated the same as married spouses:

> For the purposes of this chapter, the terms spouse, marriage, marital, husband, wife, widow, widower, next of kin, and family shall be interpreted as applying equally to state registered domestic

3

partnerships or individuals in state registered domestic partnerships as well as to marital relationships and married persons, and references to dissolution of marriage shall apply equally to state registered domestic partnerships that have been terminated, dissolved, or invalidated, to the extent that such interpretation does not conflict with federal law. Where necessary to implement this act, gender-specific terms such as husband and wife used in any statute, rule, or other law shall be construed to be gender neutral, and applicable to individuals in state registered domestic partnerships.

LAWS OF 2009, ch. 521, § 5 (codified at RCW 26.26.914). Under this amendment to the UPA, domestic partners would also be considered parents of a child born during the domestic partnership under the provision that a man was presumed the father of a child during his marriage to the mother. Former RCW 26.26.116(1)(a) (2002), *amended by* LAWS OF 2011, ch. 283, § 8. Thus, the gap that existed when we decided *L.B.*—the statutory framework governing parentage did not treat same-sex couples the same as their married heterosexual counterparts—was filled by the 2009 enactments that placed same-sex domestic partners and married couples on equal footing.

The question before us today is this: given that the reason for the de facto parentage doctrine no longer exists, should we defer to the legislature and follow the statutory scheme, or should we expand the de facto parentage doctrine to include other relationships that were never omitted from the statutory scheme? By needlessly enlarging the reach of the de facto parentage doctrine in this case, the majority places its judgments above the legislature's.

It is not the role of this court to second-guess legislative enactments. *State v. Saintcalle*, 178 Wn.2d 34, 66, 309 P.3d 326 (2013) (Stephens, J., concurring) ("[O]bviously it is not our role to legislate."), *petition for cert. filed*, No. 13-7134 (Oct.

4

25, 2013). When the legislature defines a status or relationship—such as parentage, marriage, or domestic partnership—it does not mean that there is a gap for this court to fill when a person falls outside the legislature's chosen definition. Under the majority's logic, every time the legislature excludes a person from having a particular legal status, this court is empowered to create a more inclusive common law remedy. *See* majority at 18.

To illustrate this point, under the majority's reasoning, this court would be entitled to tinker with very clear presumptions of parentage created by the legislature. Under current law, a person is presumed to be the parent if the "person and the mother or father of the child were married to each other or in a domestic partnership with each other and the child is born within three hundred days after the marriage or domestic partnership is terminated . . . ." RCW 26.26.116(1)(b). Necessarily, this statute means that a person whose marriage ended 301 days ago would not be a presumed parent if his or her ex-spouse or domestic partner gives birth to a child. Yet the majority's position appears to be that this court could declare that the person divorced 301 days before a child's birth is a presumed parent, perceiving that the legislature has not adequately considered every way that a parent-child relationship forms. The majority would usurp the legislature's clear policy choice.

The difficulty with the majority's position is also demonstrated by looking to other provisions in the domestic relations title in which the legislature has similarly sought to define or restrict a particular relationship. Taking the example of domestic partnerships, Washington law currently allows two persons to enter into a state

5

registered domestic partnership when several criteria are met: both persons must share a residence, must be older than 18 years, may not be married to or in a domestic partnership with another person, must be capable of consenting to the domestic partnership, and must not be closer in sanguinity than second cousins. RCW 26.60.030(1)–(5). As noted, the statute requires that "[e]ither (a) both persons are members of the same sex; or (b) at least one of the persons is sixty-two years of age or older." RCW 26.60.030(6).

Such restrictions on who may qualify for domestic partnership might lead to results perceived to be unfair or arbitrary. For example, the legislature restricts heterosexual domestic partnerships by the age of one of the partners because "some social security and pension laws . . . make it impractical for these couples to marry." RCW 26.60.010. One can easily imagine a situation that would make it impractical for a 61-year-old to marry, e.g., if he or she collected benefits from a deceased spouse. If the majority's logic in this case is extrapolated, this court would have the power to determine that the legislature could not have intended for the 61-year-old to lose survivor benefits and to grant a "common law" remedy to allow him or her to enter a heterosexual domestic partnership. Though perhaps well intentioned, the majority would rewrite the domestic partnership statute.

These examples demonstrate that the legislature has already decided that 300 days is the timeline following the termination of a marriage or domestic partnership that a person will be presumed the parent upon the birth of a child to the person's ex-spouse or ex-partner. The legislature has already determined that 62 is the age at which heterosexual couples may enter domestic partnerships. The

6

legislature makes such policy decisions every day. Although at times a one-size-fits-all statute might appear unfair, this is the nature of the legislative branch of government making policy choices. The majority's decision to expand the de facto parentage doctrine overrides the legislature's chosen statutory scheme and substitutes the majority's own policy choice.

Though we might not always agree with the legislature, we do not rewrite statutes to insert our own policy judgments. *Bain v. Metro. Mortg. Grp., Inc.*, 175 Wn.2d 83, 109, 285 P.3d 24 (2012) ("The legislature, not this court, is in the best position to assess policy considerations."); *Sedlacek v. Hillis*, 145 Wn.2d 379, 390, 36 P.3d 1014 (2011) ("[T]he Legislature is the fundamental source for the definition of this state's public policy and we must avoid stepping into the role of the Legislature by actively creating the public policy of Washington."). The policy making branches of government are better equipped to balance the competing interests involved to create a statutory framework governing the relationships among parents and children. Rather than circumventing the legislature's policy determinations, we should commend the often difficult decisions regarding the dynamic realities of Washington's domestic relations to the legislature's capable hands.

The legislature filled the gap that this court addressed in *L.B.* by granting same-sex couples the same rights as married couples through domestic partnerships. There is no more need for de facto parentage. The majority should not extend a doctrine that has so clearly been rendered obsolete by legislative enactment.

7

II. The majority's confounding need to fashion common law solutions to remedy the legislative scheme opens a rift between applicable statutes and this court's decisional law

This case involves the UPA as it was written prior to several 2011 legislative amendments. However, the majority insists that regardless of evolving statutory law, this court should continue to provide a separate common law remedy for any factual scenario that the legislature might not have contemplated. *See* majority at 17-18. This overlooks the fact that the common law is the rule of decision for the courts only "so far as it is not inconsistent with the . . . laws . . . of the state of Washington." RCW 4.04.010. The majority's willingness to override the will of the legislature will result in a division between statutes and case law in the area of parentage, making our jurisprudence irreconcilable with the policies that the legislature has enacted.

Two years ago, the legislature amended the UPA significantly in a manner that further obviates the need for the de facto parentage doctrine. As part of the 2011 amendments, the legislature declared:

> The provisions [of the UPA] apply to persons in a domestic partnership to the same extent they apply to persons in a marriage, and apply to persons of the same sex who have children together to the same extent they apply to persons of the opposite sex who have children together.

LAWS OF 2011, ch. 283, § 4(2) (codified as amended at RCW 26.26.051(2)); *see also* *id.* § 54 (expressing "intent that the act apply to persons of the same sex who have children together to the same extent the act applies to persons of the opposite sex who have children together.") (codified as amended at RCW 26.26.903).

More importantly, the legislature has codified the de facto parentage doctrine by creating a presumption of parentage for any person "if, for the first two years of

8

the child's life, the person resided in the same household with the child and openly held out the child as his or her own." *Id.* § 8(2) (codified as amended at RCW 26.26.116(2)).

Furthermore, last year, the legislature passed legislation permitting same-sex couples to marry. *See* LAWS OF 2012, ch. 3, § 1(1)[2] ("Marriage is a civil contract between two persons who have each attained the age of eighteen years, and who are otherwise capable.") (codified as amended at RCW 26.04.010(1)). This reflects additional legislative intent since the *L.B.* decision to treat households containing same-sex and opposite-sex couples equally.

In light of these amendments equalizing same-sex and opposite-sex couples in all respects and codifying the de facto parentage doctrine, the legislature has expressed its intent that chapter 26.26 RCW apply to all determinations of parentage.[3] The legislature has set forth several circumstances under which the parent-child relationship is formed, including giving birth to a child outside of a

---

[2] Marriage equality for same-sex couples was subject to Referendum Measure 74 in the November 6, 2012 election. The referendum was approved by Washington voters. *See* WASH. SEC'Y OF STATE GENERAL ELECTION RESULTS: REFERENDUM MEASURE NO. 74 CONCERNS MARRIAGE FOR SAME-SEX COUPLES, http://www.vote.wa.gov/results/20121106/Referendum-Measure-No-74-Concerns-marriage-for-same-sex-couples.html (last visited Nov. 22, 2013).

[3] The majority makes much of the fact that the legislature amended the UPA so that it "applies to determinations of parentage" rather than "governs every determination of parentage." *Compare* LAWS OF 2011, ch. 283, § 2(1), *with* LAWS OF 2002, ch. 302, § 103(1); majority at 17. The majority asserts that this amendment indicates that the legislature did not intend to alter the judicially created de facto parentage doctrine. Majority at 17. However, our legislature was merely following the lead of the National Conference of Commissioners on Uniform State Laws who made this change "in response to objections that the phrase 'governs every determination of parentage' was excessively broad and could conflict with other state laws, such as those governing probate issues." UNIF. PARENTAGE ACT (2000) § 103 (amended 2002), 9B U.L.A. 17 cmt. (Supp. 2013). Concerns prompted by potential conflicts with probate laws hardly suggest that the legislature intended the courts to create parallel causes of action for adjudicating parentage claims.

9

surrogacy agreement, RCW 26.26.101(1); adoption, RCW 26.26.101(3); a "man's having signed an acknowledgment of paternity," RCW 26.26.101(6); a person's consent to assisted reproduction by his or her spouse or domestic partner, RCW 26.26.101(7); and via a surrogate parentage contract, RCW 26.26.101(8). In addition, RCW 26.26.101(5) provides that a parent-child relationship may be formed by "[a]n unrebutted presumption of the person's parentage of the child under RCW 26.26.116."

After the 2011 amendments, the presumption of parentage arises in two circumstances. First, under RCW 26.26.116(1), persons are presumed to be parents of a child if they are married or in a domestic partnership at the time of the child's birth or were married or in a domestic partnership within 300 days before the child's birth. Second, parentage is presumed when an adult has lived with and publicly acknowledged a child as his or her own during the first full two years of the child's life. RCW 26.26.116(2). These presumptions of parentage are the only presumptions provided in the statutory scheme and may only be rebutted by an adjudication proceeding, RCW 26.26.116(3), in which the "parentage of a child having a presumed . . . parent . . . may be disproved only by admissible results of genetic testing excluding that person as the parent of the child or identifying another man as the father of the child," RCW 26.26.600(1).

Given the legislature's provision of the very specific, enumerated ways that the parent-child relationship is formed in our state, we must rely solely on chapter 26.26 RCW when determining whether a nonparent adult may state a parentage claim. The majority's assertion that the legislature has not "anticipate[d] every way

10

that a parent-child relationship forms," majority at 18, is incorrect and completely unworkable in light of the comprehensive scheme enacted by the legislature. Going forward, we cannot have parallel parentage schemes, one legislative and one judicial. Rather, we must follow the law as written by the legislature.

III.     The right to control parenting decisions is fundamental and should not easily be waived by consent to a parent-like relationship

In addition to the fact that the legislature has remedied the problem we faced in *L.B.*, this court and the United States Supreme Court have recognized that the "Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion); *see also In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, 109 P.3d 405 (2005) (recognizing that parents have a fundamental right to autonomy in child-rearing that is protected as a matter of substantive due process). Indeed, the *Troxel* court acknowledged that a parent's interest in caring for his or her children "is perhaps the oldest of the fundamental liberty interests recognized by this Court." 530 U.S. at 65.

Although in *L.B.* we indicated that a parent's consent to formation of a parent-like relationship adequately addressed the parent's constitutional interest in controlling parenting decisions, 155 Wn.2d at 709, this case is a different matter. In *L.B.*, a same-sex couple planned to raise L.B. together and proceeded to parent L.B. in the same household for six years following her birth. *Id.* at 683-84. Here, by contrast, Laurie Holt had planned to raise B.M.H. with the child's biological father

11

until he unexpectedly died. Although Michael and Laurie Holt married following B.M.H.'s birth, they did not remain together for even two years of B.M.H.'s life. These factual differences call for this court to reexamine whether and to what extent consent to a parent-like relationship constitutes a waiver of the fundamental parenting right. Indeed, in this case, Michael and Laurie Holt discussed the possibility of Michael adopting B.M.H., which they ultimately decided against. The choice of the parties not to adopt reinforces if not compels the conclusion that Laurie Holt did not intend to give up her right to be B.M.H.'s sole parent.

We indulge every reasonable presumption against the waiver of a fundamental right. See City of Bellevue v. Acrey, 103 Wn.2d 203, 207, 691 P.2d 957 (1984). For all other tests of presumed parentage under the UPA, we require the formality of a written document: a certificate of marriage, RCW 26.04.080, .090; a certificate of state registered domestic partnership, RCW 26.60.040(2); or a recorded assertion of parentage, RCW 26.26.116(1)(d). The formality of these documents places the world on notice that a child born during these relationships is a child of the relationship and clearly tells the natural parent that he or she is entering into a relationship with significant consequences for parenting the child. The requirement of a formal document was satisfied in L.B. because the nonbiological parent alleged that she, the biological mother, and the biological father "signed notarized documents agreeing that [the two women] would be the parents of the

12

child and that [the biological father] would have no involvement." *L.B.*, 155 Wn.2d at 684 n.1.[4]

By contrast to *L.B.* and the requirements of the UPA, there appear to be no formal documents or agreements that would serve to place Laurie Holt on notice that she was relinquishing exclusive control of raising her child. In circumstances such as these, we should not easily permit parents to unknowingly relinquish their fundamental right to control childrearing because, at some point in the past, however briefly, they consented to and fostered a parent-like relationship of another adult with their child. Absent clear evidence of an intent to permanently share parenting with a nonparent, Laurie Holt has a well established constitutional right to parent her child without interference by the state or Michael Holt.

## CONCLUSION

Under the statutory scheme that applies to the case before us, the reasons underlying our adoption of the de facto parentage doctrine have been fully resolved by the legislature. No longer do same-sex couples who parent require an equitable remedy to allow them to do so. Despite the legislature's comprehensive enactments governing parentage, the majority dangerously insists that Washington have two parentage schemes: one based in statute and one based on the instincts of a majority of this court. But we should not expand a doctrine that has outlived its usefulness. Instead, we must defer to the legislature, giving effect to its public policy

---

[4] The biological mother admitted the existence of the notarized documents but claimed that she was "unaware of their whereabouts and ha[d] no recollection of their contents." *L.B.*, 155 Wn.2d at 684 n.1. But we assumed the truth of the allegations of the nonbiological mother for purposes of the decision. *Id.* at 684 n.2. Thus, for purposes of our opinion, the notarized agreements among the parties were established facts.

choices in the arena of familial relationships. Moreover, important constitutional rights such as the right to parent should not simply be waived by consenting to a nonparent's temporary parenting role; rather, waiver should be a fact-specific inquiry that should at least require knowledge of its consequences on the parenting relationship. Accordingly, I would reverse the Court of Appeals and remand this matter to the trial court for dismissal of Michael Holt's de facto parentage claim.

I dissent.

_____
Wiggins, J.