IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Custody of S.F.-T.C., | ) ) ) | No. 32367-6-III |
| A Minor Child. | ) ) ) | |
| Janet Carey, Nick Carey, Laura Carey, | ) ) ) ) | UNPUBLISHED OPINION |
| Respondents, | ) ) | |
| v. | ) ) | |
| Jasmine Rose Carey, Mother, Kyle Carey, Father, Deceased, | ) ) ) | |
| Appellant. | ) ) | |

SIDDOWAY, C.J. — Following an eight-day trial that took place in September 2013, the superior court for Benton County awarded nonparental custody of Jasmine C.'s then nine-year-old daughter, S., to her paternal uncle and aunt. The trial court's findings of fact included its finding that the petitioning uncle and aunt had not "established by clear and convincing evidence, nor even by a preponderance of the evidence, that [Jasmine] is an unfit parent." Clerk's Papers (CP) at 338. But relying on the opinions of

three witnesses that S. had suffered an unusual and risk-presenting amount of trauma during the first seven-and-a-half years of her life, the court concluded that there would be actual detriment to S.'s future growth and development if she were returned to her mother's care.

In nonparental custody cases, when properly applied, the nonparent will meet the actual detriment standard solely in "extraordinary circumstances." *In re Custody of B.M.H.*, 179 Wn.2d 224, 236, 315 P.3d 470 (2013) (quoting *In re Custody of Shields*, 157 Wn.2d 126, 145, 136 P.3d 117 (2006)). The nonparent must show that the child has significant special needs that would not or could not be met in her parent's custody, or some serious diagnosed emotional instability that will be exacerbated by the placement. *In re Custody of J.E.*, 189 Wn. App. 175, 189-90, 356 P.3d 233, (2015). The actual detriment standard is not met by showing that nonparental custody is in the child's best interests.

The superior court's findings in this case do not reflect extraordinary circumstances, nor was the evidence at trial sufficient to support findings that would, in turn, support a conclusion that placement would result in actual detriment to S.'s future growth and development. Accordingly, we reverse the custody decree.

## FACTS AND PROCEDURAL BACKGROUND

Jasmine C. married S.'s father, Kyle, 18 days after her 16th birthday. She gave birth to S. when she was 18 years old. Kyle and Jasmine took drugs together, including

2

methamphetamine, and they had a stormy relationship. They divorced in March 2007, when S. was two-and-a-half years old. Despite testing positive for methamphetamine during the dissolution proceedings, Jasmine was awarded custody of S.

In January 2008, Jasmine learned from three-and-a-half-year-old S. that Will Higgins, a friend of Kyle's who had lived in the past in the couple's household and was living in Jasmine's home at the time, had sexually assaulted S. Jasmine sought and obtained protection orders for S. and initiated and cooperated with a police investigation that led to Higgins' conviction. Jasmine also began taking S. to Lyn Lang, a mental health counselor, to address emotional fallout from the assault.

In December 2008, police received a report that led them to visit Jasmine's apartment, which they found to be unsanitary and in disarray. The investigating officer told Jasmine he would file a report with Child Protective Services. When a follow-up visit in January 2009 revealed unchanged conditions, S. and a younger stepsister—B., Jasmine's child with another man—were placed in protective custody. Kyle thereafter sought to modify the parenting plan for S., and in June 2009 he was granted full custody. The parenting plan entered at that time provided that Jasmine would initially be permitted one four-hour visit with S. each week, but visits were required to be supervised by a licensed and approved provider and Jasmine was required to "pay all costs associated with this supervision." CP at 17.

3

Jasmine, who presented evidence of chronic medical problems, was prescribed medications and continued to use and abuse drugs for the next several years. She did not see S. during the three years that Kyle had custody.

In early January 2012, Jasmine gave birth to a third daughter, J. A dependency was filed before Jasmine could take J. home from the hospital. The Department of Social and Health Service's offer of services during the dependency was the beginning of a process through which Jasmine began addressing her parental deficiencies. After successfully participating in the services, Jasmine regained custody of J. on May 17, 2012, and the dependency was dismissed.

On March 1, 2012, while the dependency proceeding dealing with J. was ongoing, Kyle committed suicide. Two weeks later, Nick and Laura Carey, Kyle's brother and sister-in-law, filed a nonparental custody petition seeking custody of S. Janet Carey, Kyle's mother, joined the petition. We sometimes refer to the petitioners hereafter as "the Careys."

Jasmine opposed the petition and sought to have the court return custody of S. to her. The court granted temporary custody of S. to Nick and Laura Carey.

After filing the petition for nonparental custody, Janet Carey contacted Ms. Lang, and arranged to renew counseling for S. with Ms. Lang. In response to Jasmine's early requests for visitation with S., the superior court entered an order on April 19, 2012, indicating it would rely on Ms. Lang for a "time frame and parameters & all details re:

4

reintroduction & reunification of Jasmine w/ [S.]" CP at 545. Janet Carey was opposed to S. having *any* visitation with Jasmine, and even Ms. Lang favored no visitation. Although Ms. Lang was notified by Jasmine's lawyer of the court's request for a reunification plan on April 24, 2012, and spoke with both parties' attorneys about the court's order on May 3, 2012, Ms. Lang failed to make any recommendation.

Jasmine sought to be reintroduced to S. for at least 10 months before the reintroduction occurred. While it is not clear from our record on appeal how Jasmine was finally able to secure visitation beginning in early February 2013, she may have acted on the 2009 parenting plan, because she began visitation at Kids at Heart, a supervised visitation provider. Between then and the time of trial, the court twice increased her visitation, removing any requirement for supervision and ordering that Jasmine's other children could occasionally be included in her visitation with S.

Trial of the petition for nonparental custody took place over eight days in late September 2013 and early October 2013. Dozens of witnesses were called. While the trial court concluded in its decision that Jasmine was a fit parent, it entered one-and-a-half pages of findings in support of its conclusion that there would be actual detriment to S.'s growth and development if she were placed in her mother's care. Its findings placed primary reliance on the testimony of Susan Holden, a school counselor and Michele Leifheit, who had been engaged to prepare an assessment of S.'s bonding with the Careys. The court's findings also placed some reliance on the testimony of Lyn Lang,

5

while at the same time stating that "it did appear that Ms. Lang did, perhaps at times lack some objectivity in regards to some of her opinions and positions in her actions in regard to this case." CP at 340.

Based on its conclusion of actual detriment, the court granted the Careys' nonparental custody petition. The parenting plan granted Jasmine visitation with S. for three hours on Mondays, five hours on Wednesdays, and one weekend a month. Jasmine appeals.[1]

## ANALYSIS

*Circumstances under which a nonparent can be awarded custody*

A parent has a fundamental liberty interest in raising his or her children without state interference. *In re Custody of Smith*, 137 Wn.2d 1, 15, 969 P.2d 21 (1998), *aff'd sub nom.*, *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). "Where a fundamental right is involved, state interference is justified only if the state can show that it has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved." *Smith*, 137 Wn.2d at 15 (citing *Roe v. Wade*, 410 U.S. 113, 155, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973).

In Washington, chapter 26.10 RCW permits a third-party nonparent to petition a court for custody of a child. Because such a request necessarily implicates the parent's

---

[1] Nick and Laura filed a cross appeal, but this court dismissed it upon their request.

fundamental right, this court affords a parent considerable deference when balancing the parent's rights against both the interests of third parties and children's rights. *J.E.*, 189 Wn. App. at 183-84. A court will only grant the third-party's petition when the nonparent establishes by clear and convincing evidence that "either the parent is unfit or custody with the parent would result in 'actual detriment to the child's growth and development.'" *Id.* at 184 (internal quotation marks omitted) (quoting *B.M.H.*, 179 Wn.2d at 234); *In re Custody of C.C.M.*, 149 Wn. App. 184, 206, 202 P.3d 971 (2009) (appropriate standard of proof is clear and convincing evidence).

A parent's rights may be outweighed when he or she is unfit. *In re Custody of Shields*, 157 Wn.2d 126, 142, 136 P.3d 117 (2006). Examples of unfitness include "the fault or omission by the parent seriously affecting the welfare of a child, preserving of the child's right to freedom from physical harm, illness or death, or the child's right to an education." *Id.* at 142-43. "If a parent's actions threaten the child's welfare, the State's interest in protecting children takes precedence" and as a result "the State is justified in removing the child from the home and, in certain cases, permanently terminating parental rights." *Id.* at 142.

"[P]arental rights may also be outweighed in custody determinations when actual detriment to the child's growth and development would result from placement with an otherwise fit parent." *Id.* at 143. There is a "presumption that a fit parent will act in the best interest of his or her child." *Id.* at 144 (citing *Troxel*, 530 U.S. at 69). "[T]he

7

interests of parents yield to state interests only where 'parental actions or decisions seriously conflict with the physical or mental health of the child.'" *B.M.H.*, 179 Wn.2d at 239 (quoting *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)). Whether placement with a parent will result in actual detriment to a child's growth and development "is a highly fact-specific inquiry" and must be determined on a "'case-by-case basis.'" *Id.* (internal quotation marks omitted) (quoting *Shields*, 157 Wn.2d at 143).

The requisite showing on the part of the nonparent is "'substantial.'" *Shields*, 157 Wn.2d at 145 (quoting *In re Custody of Shields*, 120 Wn. App. 108, 123, 84 P.3d 905 (2004)). Further, a nonparent will only be able to show actual detriment in "extraordinary circumstances." *Id.* (quoting *In re Marriage of Allen*, 28 Wn. App. 637, 649, 626 P.2d 16 (1981)). Merely demonstrating that nonparental custody is in "the best interests of the child" is insufficient to show actual detriment. *J.E.*, 189 Wn. App. at 185.

In *B.M.H.*, our Supreme Court offered as examples of where the actual detriment standard has been met,

> when a deaf child needed a caregiver who could effectively communicate with the child and the father was unable to do so, *see Allen*, 28 Wn. App. at 640-41, [626 P.2d 16, (1981),] when a suicidal child required extensive therapy and stability at a level the parents could not provide, *see In re Custody of R.R.B.*, 108 Wn. App. 602, 31 P.3d 1212 (2001), and when a child who had been physically and sexually abused required extensive therapy and stability at a level the parent could not provide, *see In re Custody of Stell*, 56 Wn. App. 356, 783 P.2d 615 (1989).

179 Wn.2d at 236.

8

*Standard of evidence and evidence relied on in this case*

"Appellate courts are generally reluctant to disturb a child custody disposition because of the trial court's unique opportunity to personally observe the parties." *In re Custody of Stell*, 56 Wn. App. 356, 366, 783 P.2d 615 (1989). For this reason, "a trial court's custody disposition is not disturbed on appeal absent a manifest abuse of discretion." *J.E.*, 189 Wn. App. at 182. A court abuses its discretion if its decision is manifestly unreasonable or is exercised on untenable grounds. *In re Dependency of H.S.*, 188 Wn. App. 654, 663, 356 P.3d 202 (2015). "A decision is based on untenable grounds or made for untenable reasons if it rests on facts unsupported by the record or was reached using the wrong legal standard." *Id.*

This court upholds a trial court's finding of fact if it is supported by substantial evidence. *J.E.*, 189 Wn. App. at 183. "The determination of whether the findings of fact are supported by substantial evidence 'must be made in light of the degree of proof required.'" *In re Dependency of A.M.M.*, 182 Wn. App. 776, 785-86, 332 P.3d 500 (2014) (quoting *In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990)). Clear and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

Whether the facts amount to actual detriment is a conclusion of law we review de novo.

Because we do not reweigh evidence or witness credibility, we focus on the trial court's findings and the evidence it found credible. The trial court's conclusion of actual detriment was based on findings that were themselves based on the testimony of three counseling professionals: Susan Holden, Michele Leifheit, and Lyn Lang. We have carefully reviewed the testimony of each witness.

*Ms. Holden* is a school counselor at Washington Elementary School in Kennewick, where S. attended first grade in the 2001-2002 school year. Ms. Holden testified at trial that she got to know S. during the year and was aware that S. had been disappointed when her father's girlfriend moved away to Prosser and when a pet parrot died. She knew that later in the year, S. suffered the trauma of losing her father to suicide. Ms. Holden was also aware that S. had been the victim of sexual assault earlier in her life, and learned from S. during the school year that S. was not allowed to see her mother. At the fall 2013 trial, Ms. Holden acknowledged that she had not seen or spoken to S. since June 2012.

Asked by the Careys' lawyer whether she had an opinion whether it would be detrimental to S. to be returned to her mother, Ms. Holden expressed her opinion that

> at that stage in her life and from all the experiences that [S.] had
> experienced that year that it was really important for her to know stability
> and to have some continuity in her life. And since she had not been with
> her mother for quite some time, *I did not think it would be wise* to move her
> to a brand-new living situation when she was dealing with grief over her
> father's loss and the removal of her brother from her home.

Report of Proceedings (RP) at 275-76 (emphasis added). Ms. Holden was clear that her opinion was with respect to "that point in [S.'s] life," namely, the spring of 2012. RP at 277.

*Michele Leifheit*, a licensed mental health counselor, testified to an assessment of the bond between S. and the Careys that she was retained to prepare in June 2013. In order to prepare the assessment, she spent about two hours in the Careys' home, observing S.'s interaction with her uncle and aunt, and about 1½ - 2 hours in her office, speaking with S. and observing her interaction with her grandmother. Ms. Leifheit had not been asked to assess whether Jasmine had a bond with S. or observe any interaction between S. and Jasmine. She did not meet or speak with Jasmine in the course of her work.

Ms. Leifheit expressed the opinion that S. and the Careys were "clearly bonded" and, when asked if she had an opinion as to how S. would be affected if she were removed from the Careys' care, she testified

> I think that it *could* be detrimental to [S.], to her definitely emotional, psychological, maybe possibly even physical well-being because of the attachment that I believe exists if that were disrupted and removed from her that it could be very detrimental to her. And again because she has a history of losses in her life so that *could* exacerbate . . . the impact of that.

RP at 368 (emphasis added). When cross-examined, Ms. Leifheit acknowledged that the fact that a child has an attachment with one individual does not rule out that an attachment exists between the child and another individual.

11

Finally, *Ms. Lang*, also a licensed mental health counselor, testified to her counseling of S. off and on for several years beginning in 2008, when Jasmine sought counseling after learning of Higgins' sexual assault; resuming in 2009, when Kyle renewed counseling after S. was taken from Jasmine's custody; and beginning again in 2012, when Janet Carey made contact with Ms. Lang following Kyle's suicide and commencement of the nonparental custody dispute.

In direct examination, Ms. Lang was asked whether, if S.'s bond with the Careys were broken and she were removed from their care, "[would] that cause a trauma to [S.]," in response to which she answered "I'm afraid it would." RP at 469. The Careys' lawyer had reviewed with Ms. Lang the loss, third party molestation and disappointment to which [S.] had been subjected in her young life, and Ms. Lang testified:

> That kind of cumulative trauma can really cause a lot of problems for a person in their life, even physical problems, and definitely mental health problems. Multiple grief causes depression quite often. So I guess that would be my biggest concern for [S.].

RP at 469-70. She later testified to a study that had been done by Kaiser Permanente about "adverse childhood experience" and the long-term effect it can have into adulthood, which she "keep[s] in mind" when counseling children. RP at 1141-42. While she had never actually performed the analysis as to S., she testified, "I think she's

12

at risk for long-term consequences." RP at 1142. In addition to the consequences she had identified earlier (physical and mental health problems) she added, "[a]lcoholism, drug abuse, early pregnancies [and] promiscuity." *Id.*

Ms. Lang testified that the reason she had continually recommended against S. having visitation with Jasmine during the custody proceeding was because she "wanted to make . . . sure [S.] didn't start seeing Jasmine if Jasmine was still using drugs and was still having a lot of instability in her life because I didn't want anything to start and then fall apart for [S.]" RP at 454-55. When cross-examined, she admitted that she never made any attempt to contact Jasmine to find out firsthand how she was doing, and had never asked for proof of her sobriety or blood tests; she agreed she had made "no attempts to find out whether or not there was stability for Jasmine." RP at 1123.

Ms. Lang acknowledged that since visitation between S. and Jasmine resumed despite Ms. Lang's opposition, S. had "reported positive things about her visits with her mom." RP at 1169. In S.'s first counseling session with Ms. Lang after visitation with her mother resumed, S. told Ms. Lang that the visitation "went well." RP at 1124. She later told Ms. Lang that "she enjoyed the visits" and she "was having a good time." RP at 461, 1127. Ms. Lang acknowledged that on the first Mother's Day after visitation resumed, S. made a card for Jasmine that said, "Happy Mommy Day. I miss you, Mommy. Did you get a job? Yes, no. I love you, Mommy." RP at 1116. Ms. Lang

13

also testified to a report she had received from Janet Carey that in a conversation with S. about losing her daddy, S. had said, "It's good because now I can see Jasmine, bad because I can't see dad." RP at 1125. She admitted that in one of S.'s counseling sessions before overnight visits with Jasmine were ordered, S. told Ms. Lang that she wanted to spend the night with her mom.

At the time of trial, Ms. Lang testified that, generally, S. was doing "amazingly well" in dealing with her father's suicide. RP at 441. She testified that the last time she had seen S., "she was looking very happy." RP at 467.

*The trial court's findings do not support an "actual detriment" conclusion*

Even under the deferential standard of review, the evidence relied on by the trial court was insufficient to establish findings that would in turn support the conclusion that reunification would cause actual detriment to S.'s growth and development in the future. Our Supreme Court's decision in *B.M.H.* and our own recent decision in *J.E.* are controlling.[2]

In *B.M.H.* the nonparent seeking custody was Michael Holt, B.M.H.'s onetime stepfather. B.M.H.'s natural father died early in his mother's pregnancy and Mr. Holt was in B.M.H.'s life from his birth—initially as a close friend and moral support for

---

[2] We recognize that both decisions were filed following the trial court's decision in this case.

No. 32367-6-III
*In re the Custody of S.F.-T.C.*

B.M.H.'s mother and, following the couple's marriage, as B.M.H.'s stepfather. While the couple divorced only two years into the marriage, B.M.H.'s mother allowed Mr. Holt visitation by agreement and even changed B.M.H.'s last name from the biological father's last name to Mr. Holt's last name following the divorce. When B.M.H. was eight years old, there were discussions about Mr. Holt adopting B.M.H., but it did not happen because of adverse effects it would have on B.M.H.'s survivor benefits received as a result of his biological father's death.

When Mr. Holt learned that B.M.H.'s mother intended to move out of state, he petitioned for nonparental custody. "The [guardian ad litem] submitted a report stating that B.M.H. viewed Mr. Holt as a father and that it would be detrimental for B.M.H. to terminate contact with Mr. Holt." *B.M.H.*, 179 Wn.2d at 233. The court found adequate cause to proceed to a hearing on the basis that "if the Respondent/mother denies contact between Petitioner and minor child it would cause actual detriment to the minor child's growth and development if the relationship between the minor child and the Petitioner is not protected." *Id.*

Notwithstanding the conclusions of the guardian ad litem and the superior court that a disruption in B.M.H.'s lifelong relationship with his onetime stepfather would result in actual detriment to his growth and development, the Supreme Court concluded that "[t]hese are not the kind of substantial and extraordinary circumstances that justify

15

state intervention with parental rights." *Id.* at 239.

> Although the importance of preserving fundamental psychological relationships and family units was part of the court's analysis in [the Supreme Court's earlier decisions in] *Allen* and *Stell*, there were more extreme and unusual circumstances that contributed to the finding of actual detriment. In each case, the child had significant special needs that would not be met if the child were in the custody of the parent. Continuity of psychological relationships and family units was particularly important where a child had these special needs. . . . This court has consistently held that the interests of parents yield to state interests only where "parental actions or decisions seriously conflict with the physical or mental health of the child."

*Id.* (quoting *Sumey*, 94 Wn.2d at 762).

*J.E.* is even more clearly on point. J.E. began living with his aunt and uncle when he was just two years old and continued to reside with them for nine years, while his mother struggled with mental illness and his natural parents remained unable to deal with the difficult terminal illness of J.E.'s sister. While J.E. was living with his aunt and uncle, his sister, with whom he was extremely close, suffered a traumatic death and J.E. became bonded to his cousins. Eventually, the Eatons, J.E.'s biological parents, determined that they were again capable of caring for J.E. and decided that they no longer wanted him to live with his aunt and uncle. In response, the Culvers, J.E.'s aunt and uncle, petitioned for nonparental custody.

The trial court determined that the Eatons were fit parents but concluded that it would not be in J.E.'s best interest for him to be returned to their full custody. Relying

16

on testimony from the guardian ad litem, the trial court concluded that J.E. would suffer actual detriment if he was removed from the "Culvers' family unit." *J.E.*, 189 Wn. App. at 181.

This court reversed the decree of custody, concluding that while the court's findings and conclusions included a recital of actual detriment, the court had, in substance, applied the too-low standard of the "best interests" of J.E. *Id.* at 189. The trial court record did not demonstrate that "J.E. has significant special needs that would not or could not be met if he were in the Eatons' physical custody." *Id.* Applying the appropriate standard, the Culvers' evidence of the traumas J.E. had endured and his close bond developed over nine years did not meet their burden of establishing actual detriment to his growth and development if returned to the custody of his parents.

Together, *B.M.H.* and *J.E.* establish that any focus on a bond between a child and the petitioner for nonparental custody misses the mark. Such evidence is only relevant to "best interests," which is not the standard that applies. The proper focus in analyzing whether "actual detriment to growth and development" applies is whether there are extraordinary circumstances such that, despite the parent's fitness, his or her custody will seriously conflict with the child's physical or mental health. *Id.* at 190. A showing of "[s]pecific facts" is required. *Id.*

In awarding custody to Nick and Laura Carey, the trial court concluded that the

evidence established by clear, cogent and convincing evidence that "[S.] would suffer actual detriment to her stability, well-being, growth and development" if removed from their custody. CP at 341. The supporting findings were findings of an asserted need for stability because of the traumas suffered so far in S.'s life. There was no identification in the findings of a special need on S.'s part that could not be met by her mother.

Properly analyzed, the question is whether there is evidence of extraordinary circumstances such that Jasmine is incapable of responding to her daughter's needs. As earlier noted, the law presumes that fit parents will act in the best interests of their children.

Based on Jasmine's evidence, the trial court found her to be a fit parent, and that she "would be able to safely provide for her children." CP at 338. Unlike *Stell*, where an actual detriment standard was based on a child's serious behavioral problems beyond his father's ability to handle, there is no evidence suggesting that S. has any behavioral problems, let alone behavioral problems that Jasmine will be unable to handle. Unlike *R.R.B.*, where there was testimony detailing multiple disorders from which the child suffered and concern for the child's safety, there was no testimony that S. is suicidal or that she suffers from disorders. In fact, the court found that "[S.] is doing amazingly well

18

for everything that she has been through." CP at 340. Finally, unlike *Allen*, there was no testimony that S. has a disability that Jasmine is unable to care for.

Instead, in this case, the trial court relied on speculation: the speculation of Ms. Leifheit that removing S. from the Careys' custody "could" be detrimental and "could" exacerbate S.'s earlier traumas, RP at 368; the testimony of Ms. Lang that she was "afraid" removal from the Careys would "cause a trauma," that cumulative trauma "can" cause problems, and that S. was "at risk" of consequences should the transfer of her custody prove traumatic; RP at 469-70, 1142; and the opinion of Ms. Holden arrived at fifteen months earlier, shortly after Kyle's suicide, that "[she] did not think it would [have been] wise" to move S. into her mother's home at that time. RP at 276. None of the witnesses spoke at all to any limitations or shortcomings in Jasmine's ability to be a good mother to S. None had any foundation from which they *could* speak to the actual detriment issue, since none ever sought information or input about or Jasmine's situation in 2012 and 2013.

For these reasons, the trial court erred in concluding that returning S. to Jasmine's custody would result in actual detriment to S.'s future growth and development. The trial court erred in granting custody to Nick and Laura Carey.

We reverse the decree of nonparental custody and remand with directions for the trial court to enter orders transitioning S. back to the custody of her mother.

19

No. 32367-6-III
*In re the Custody of S.F.-T.C.*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.