
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Custody of BNH, BIF, and BTH, | No. 76046-7-I (consolidated with 76047-5-I & 76048-3-I) |
| Children. | |
| | DIVISION ONE |
| JOSHUA L. HARRISON, | |
| Respondent, | |
| v. | |
| KRYSTLE L. FURROW (n/k/a DUVALL), | UNPUBLISHED OPINION |
| Appellant, | FILED: April 23, 2018 |
| FADI FAKHOURI and ERYK HARDIN, | |
| Defendants. | |

BECKER, J. — Appellant Krystle Furrow, now known as Krystle Duvall, is the mother of three children. Respondent Joshua Harrison is the biological father of one of those children. Duvall seeks reversal of an order establishing that Harrison is a de facto parent to the other two children. She also challenges a parenting plan by which the children are scheduled to reside primarily with Harrison. Duvall identifies no persuasive basis for overturning the trial court orders. We affirm.

## FACTS

Duvall was in tenth grade when she became pregnant with her first child. She gave birth to a girl, BNH, in June 2003. She married the girl's father, Eryk Hardin. He and Duvall separated a few months after getting married.

In early 2004, Duvall began a relationship with Harrison. At the time, Duvall was living in her sister's home and working at a fast food restaurant. She and Harrison decided to live together. Duvall and the baby, then eight months old, moved into Harrison's apartment. Duvall was still legally married to Hardin, but he had moved to Minnesota. That marriage was later dissolved by decree and a parenting plan was entered allowing Hardin to have supervised visits with his daughter.

Duvall became pregnant with Harrison's child. A boy, BTH, was born in February 2006. Harrison testified that around this time, he started spending more one-on-one time with Duvall's daughter, BNH. He said he wanted to avoid a situation where she felt neglected because there was a new baby in the family. He testified that he and BNH "went on many walks. Our bond strengthened."

Duvall moved out in 2008. At trial, she and Harrison gave different reasons for the breakdown of their relationship. Duvall said that Harrison was verbally and emotionally abusive, while Harrison said the couple's problems stemmed from the fact that Duvall was "partying" frequently. Duvall moved in with a man named Fadi Fakhouri. Both children stayed with Harrison.

2

Later in 2008, Duvall and Fakhouri decided to move to England together. Before leaving, Duvall executed a power of attorney granting Harrison authority to make medical and educational decisions for both children. When asked during trial why she left, Duvall responded, "I don't know. I was young. I had two kids. I didn't know what I was doing."

The trial court found that Duvall returned to the United States from England "one or two, or possibly three times." Her contacts with the children during these visits are described as few and brief. "Josh put [BNH] in counseling through the school to deal with the issue of her mother being gone." Duvall does not assign error to the findings entered by the trial court. We accept them as verities on appeal. In re Dependency of C.B., 79 Wn. App. 686, 691, 904 P.2d 1171 (1995), review denied, 128 Wn.2d 1023 (1996).

Duvall and Fakhouri moved back to Washington in mid-2010. They lived together in Redmond in a house rented by Fakhouri. The two children continued to live primarily with Harrison.

Duvall became pregnant with Fakhouri's child. She gave birth to a girl, BIF, in October 2012. By the time this child was born, Fakhouri had moved out of the house he shared with Duvall. The trial court found that Fakhouri spent "some time" with BIF before relocating to Europe.

Duvall and the baby remained in the house that Fakhouri had rented. Duvall could not afford the rent. In November 2012, Harrison took over the lease and he and the two older children moved in with Duvall and her newborn. Harrison and Duvall soon resumed a close relationship. Harrison started

3

bonding with the new baby; he testified that he took on "a parental role" and began "wanting the best for her." Duvall testified that during this period she was responsible for the majority of the parenting tasks as to all three children. Harrison had a full-time job at a paint store.

In June 2014, Harrison and Duvall decided to separate. At trial, Harrison cited Duvall's drinking habits as a source of the couple's problems. In July 2014, Duvall moved in with Robert Duvall, a man she later married. Harrison moved in with his sister. Harrison and Duvall informally agreed that the children would split time between households—one week with Duvall, the next week with Harrison, and so on. This arrangement did not work out as planned. The three children ended up living mainly with Harrison in his sister's home.

In August 2014, Harrison filed petitions seeking nonparental custody of the girls, BNH and BIF, who were then 11 years old and 1 year old, respectively. To establish adequate cause to proceed with a nonparental custody action, the petitioner must (1) show that the child is not in the physical custody of a parent or the parents are unsuitable custodians and (2) allege specific facts that, if proven true, establish that the parent is unfit or the child would suffer actual detriment if placed with the parent. RCW 26.10.032(1); In re Custody of E.A.T.W., 168 Wn.2d 335, 344-45, 227 P.3d 1284 (2010). Harrison alleged that neither of the two girls had "resided a significant amount of time" with their biological parents and the parents were not suitable custodians because they could not provide safe, stable homes for the children. He asked that Duvall's visitation rights be limited for several reasons, including willful abandonment, and that the biological

4

fathers' visitation rights be limited because each had abandoned his child and substantially refused to perform parenting functions. Harrison asserted that granting him nonparental custody would serve the girls' best interests, in part because he had the ability and desire to provide a safe, stable home and the girls were emotionally bonded with him. Harrison also filed a petition for a parenting plan by which his then 8-year-old son, BTH, would reside mainly with him.

Duvall asked the court to dismiss the nonparental custody petitions and reject Harrison's proposed parenting plan as to their son. A commissioner found adequate cause to proceed with the petitions. Trial was set for January 2016. By temporary orders, the children were scheduled to reside mainly with Harrison.

A guardian ad litem prepared a 53-page report that documented information obtained through interviews with Duvall, Harrison, and the older two children, as well as others involved in the children's lives. The report conveys the impression that Harrison was a consistent caregiver to all three children throughout their lives. The guardian ad litem observed that Harrison "could be considered a de facto parent" to the girls:

> It appears that Josh has had the more consistent, dependable and comfortable relationship with the children. The information provided and/or developed during the course of this investigation supports that Krystle consented to and fostered the parent-child relationship between Josh and [BNH] and to a lesser extent with [BIF]. Josh and all three children have lived together in the same home when Josh and Krystle were together and when separated. Josh assumed all obligations of parenthood without expecting any sort of compensation, such as financial compensation. Josh has been parenting for a length of time that has resulted in a parent-like bond with both children. It would appear that Josh could be considered a de facto parent to both [BNH] and [BIF] but that is a legal determination for someone else to make.

5

The guardian ad litem's observations conform to the criteria for establishing de facto parentage. See In re Parentage of L.B., 155 Wn.2d 679, 708, 122 P.3d 161 (2005), cert. denied, 547 U.S. 1143 (2006).

The guardian ad litem reported that Duvall's involvement in the children's lives had been less consistent than Harrison's. In particular, he described Duvall as "misguided" when she went to Europe. Despite not intending to do so, Duvall "in effect abandoned her children." The report states that more recently, Duvall had become actively involved in caring for the children and appeared "committed to having a parenting role with them, even a primary role." The guardian ad litem noted concerns with respect to Duvall's parenting, including that she allegedly told the children that they would no longer see Harrison after the end of the case. The report states that "Krystle needs to understand that from the perspective of all three children Josh has been their father. . . . Krystle should say nothing and do nothing that detracts from the sense of security the children derive from having that safe and consistent relationship with their dad." The guardian ad litem recommended limiting Duvall's residential time with the children because of "willful abandonment." She also wrote that Duvall's "neglect or substantial non-performance of parenting functions" and her "abusive use of conflict" was conduct that could adversely impact the children.

The guardian ad litem found that neither of the girls' biological fathers was meaningfully involved in caring for the children. Hardin had minimal contact with BNH over the years. Fakhouri was living outside the United States and had no contact with BIF.

Trial on the nonparental custody petitions began on January 13, 2016. Both Harrison and Duvall appeared pro se. The court heard testimony from Harrison, Duvall, their family and friends, and the guardian ad litem. Harrison's questioning and argument focused on showing that he had been the more devoted and responsible caregiver. Duvall argued that Harrison had not proved the allegations in the petitions. She asked the court to order that all three children reside with her and to allow Harrison to have visitation only with their son, BTH. At the conclusion of argument, the judge said that he needed additional time to review the evidence and relevant cases, including In re Custody of B.M.H., 179 Wn.2d 224, 315 P.3d 470 (2013) (holding that under certain circumstances, a stepfather may have de facto parent status).

One week later, on January 27, 2016, the court issued an order asking the parties to brief the issue of de facto parentage. After both parties submitted briefing—Harrison asserted that he was a de facto parent, Duvall asserted that the issue should not be considered—the court entered an order allowing Harrison to petition for de facto parentage, reasoning that trial evidence proved the issue relevant. "This evidence was admitted without objection by either party, and with some recognition, pre-trial, by the Respondent, that this case had issues implicating the status of the Petitioner as a de facto parent." In a motion to dismiss Harrison's petitions, Duvall had mentioned Harrison's "possible standing" as a de facto parent. The court determined that the issue of de facto parentage had been tried by implied consent under CR 15(b) but that allowing additional

argument and evidence was warranted. Harrison filed an amended petition seeking a determination that he is a de facto parent to both girls.

The amended petition came on for hearing on July 11, 2016. Over the course of three days, the parties, at this point both represented by counsel, presented evidence and argument bearing on Harrison's potential status as a de facto parent. The trial court concluded that Harrison proved de facto parent status. The court entered a parenting plan by which all three children are scheduled to reside primarily with him. The plan limits Duvall's residential time with the children to alternating weekends and a mid-week visit until she engages in further counseling.

Duvall appeals. She argues that flaws in the trial court proceedings render the trial court orders "null and void." She also claims the record does not support a determination that Harrison is a de facto parent to the younger girl, BIF. She does not challenge the trial court's conclusion that Harrison is a de facto parent to the older girl. In a pro se brief of respondent, Harrison asks us to affirm.

TRIAL COURT'S AUTHORITY TO PROCEED ON AMENDED PETITION

Duvall contends the trial court erred by proceeding with Harrison's de facto parent petition without issuing a decision on his nonparental custody petitions. She makes two arguments in support of this position: that a decision was required on the nonparental custody petitions per a rule of judicial conduct, CJC 2.7, and the later hearings on de facto parentage were barred by res judicata. Neither argument is persuasive.

8

"A judge shall hear and decide matters assigned to the judge, except when disqualification or recusal is required by Rule 2.11 or other law." CJC 2.7. Duvall claims the judge violated this rule by failing to decide the original issue of nonparental custody. She raised this argument below only to the extent that she objected to proceeding with the de facto parent petition; she did not invoke CJC 2.7 in doing so. We generally do not review issues raised for the first time on appeal. RAP 2.5(a). Even assuming the claim is reviewable, we find no basis for interpreting CJC 2.7 in the manner suggested by Duvall. Her argument relies on the incorrect assumption that the nonparental custody issue was a separate matter requiring a decision separate from the court's decision on Harrison's potential status as a de facto parent. Both issues were in the same case. The trial judge complied with his responsibility to "decide matters" assigned to him when he recognized that the evidence implicitly raised the issue of de facto parentage, allowed amendment of the petition, and entered final orders resolving the overarching question of Harrison's legal relationship to the children. There was no violation of CJC 2.7.

Duvall argues that under the doctrine of res judicata, litigation of Harrison's nonparental custody claim barred the subsequent litigation about de facto parentage. Duvall raised this argument below in response to the trial court's request for briefing on the applicability of de facto parent principles. Our review is de novo. Ensley v. Pitcher, 152 Wn. App. 891, 899, 222 P.3d 99 (2009), review denied, 168 Wn.2d 1028 (2010).

9

The threshold requirement of res judicata is a valid and final judgment on the merits in a prior suit. Ensley, 152 Wn. App. at 899; see also Kelly-Hansen v. Kelly-Hansen, 87 Wn. App. 320, 328-29, 941 P.2d 1108 (1997). This requirement is not met here. There was no "final judgment" in a "prior suit." The trial court considered two claims—nonparental custody and de facto parentage—that were both raised in the same suit. Res judicata does not apply under these circumstances.

## ISSUES AFFECTING BIOLOGICAL FATHERS

In a third party custody proceeding, the child's parent is entitled to notice. RCW 26.10.030. The record suggests that both Hardin and Fakhouri were aware of the proceedings, that is, they at least had informal notice. Harrison's sister testified that she communicated with Fakhouri about this lawsuit. Hardin joined in the de facto parentage petition. But there is no documentation in the record to show that the biological fathers were formally served. Neither was present during the proceedings.

At trial, Duvall moved to dismiss Harrison's petitions based on lack of notice to the biological fathers. This motion was denied. Duvall contends that the trial court's decision to proceed in the absence of notice to the fathers is another reason to declare the orders null and void. She argues, without citation to authority, that she has standing to assert her two girls' right to a relationship with their biological fathers.

Harrison contends that Duvall lacks standing to pursue the notice issue. We agree. A requirement for third party standing is that the litigant has suffered

10

an injury in fact that gives her a sufficiently concrete interest in the outcome of the issue in dispute. In re Custody of S.R., 183 Wn. App. 803, 809, 334 P.3d 1190 (2014). Duvall does not show she has suffered an injury in fact. So far as the record reveals, Duvall's situation would not be any different if the fathers had been served with formal notice.

Another requirement to assert the rights of a third party is that there must exist some hindrance to the third party's ability to protect his own interests. Custody of S.R., 183 Wn. App. at 809. That requirement is not met. The orders do not terminate the biological fathers' rights or otherwise hinder the children's ability to maintain relationships with them. If either absent father wants to become more involved at some point in the future, the orders entered by the trial court will not prevent him from asserting his parental rights. There is no reason to believe Harrison's status as a de facto parent would be an obstacle if this happened. At oral argument before this court, Harrison said that he would "love to see either father in a loving relationship with their respective children." The record shows that Harrison has facilitated the older girl's contact with her biological father, Hardin, and Hardin's parents.

Duvall also argues that the biological fathers should have been joined in the action under CR 19. That rule requires joinder when complete relief cannot be afforded among those already parties or the person claims an interest in the action. CR 19(a). Duvall contends that in the event the fathers could not be joined, the trial court was obligated to decide whether to proceed in their absence applying factors listed in CR 19(b).

11

As to Hardin, as previously noted, he did join in Harrison's petition for custody under the de facto parent doctrine. As to Fakhouri, Duvall's argument is premised on alleged harm to him. She contends joinder of an absent father is required to protect his constitutional interest in raising his child. Again, Duvall does not show that she herself is affected by nonjoinder of Fakhouri. Fakhouri has not claimed an interest in the action. The trial court was able to afford complete relief among "those already parties"—Duvall and Harrison. CR 19(a)(1). We conclude that Duvall is not entitled to relief from the final orders on the ground of nonjoinder.

For similar reasons, we reject Duvall's challenges to the parenting plan. She contends the plan cannot stand, first because it does not mention Hardin or Fakhouri and second because it modifies the 2006 parenting plan governing Hardin's involvement with BNH without satisfying modification requirements set forth in RCW 26.09.060 and RCW 26.09.270. Duvall did not make these arguments below and thus failed to preserve them for appeal. She also fails to show that she has standing to advance a challenge to the parenting plan on behalf of absent fathers who have shown no interest in parenting. If either father should wish to come forward and establish a legally recognized role in his child's life, nothing in the parenting plan prevents him from doing so. At trial, Duvall could not recall the last time that Hardin invoked his visitation rights under the 2006 parenting plan. As for Fakhouri, the trial court found that his "present residence is unknown, but he is believed to live somewhere in Europe, and to be a citizen of Jordan."

HARRISON'S STATUS AS A DE FACTO PARENT

Duvall argues that the trial court abused its discretion in concluding that Harrison is a de facto parent to the younger girl, BIF. We disagree.

"De facto parentage is a flexible, equitable remedy that complements legislative enactments where parent-child relationships arise in ways that are not contemplated in the statutory scheme." B.M.H., 179 Wn.2d at 240. The doctrine serves to protect the interests of children born into nontraditional families, including "interests they may have in maintaining their relationships with the members of the family unit in which they are raised." L.B., 155 Wn.2d at 694.

There are four criteria for establishing de facto parentage: (1) the natural or legal parent consented to and fostered the parent-like relationship; (2) the petitioner and child lived together in the same household; (3) the petitioner assumed obligations of parenthood without expectation of financial compensation; and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature. L.B., 155 Wn.2d at 708. "In addition, recognition of a *de facto* parent is 'limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life.'" L.B., 155 Wn.2d at 708, quoting C.E.W. v. D.E.W., 2004 ME 43, ¶ 14, 845 A.2d 1146, 1152. Obtaining de facto parent status under these standards should be "no easy task." L.B., 155 Wn.2d at 708, 712. A de facto parent stands in legal parity with an otherwise legal parent. L.B., 155 Wn.2d at 708.

Duvall argues that insufficient evidence supports the first factor—that she consented to and fostered a parent-like relationship between Harrison and the younger daughter. This factor is concerned with protecting the constitutional rights of the natural or legal parent. B.M.H., 179 Wn.2d at 240, 241.

Duvall places undue weight on testimony by the guardian ad litem that finding the first criterion to be satisfied would be "a bit of a stretch." In response, Harrison asked the guardian ad litem if it would affect his opinion to know that Duvall encouraged BIF to call Harrison "Daddy." The guardian ad litem responded, "Sure."

Harrison presented testimony that when BIF was a baby, Duvall referred to Harrison as "Daddy" when talking to BIF. Although Duvall denied doing so, the trial court was entitled to determine that Harrison's evidence was more credible. The court also heard testimony that from the beginning, Duvall consented to Harrison's involvement in parenting tasks involving this child.

Duvall also contends that insufficient evidence supports the fourth factor— whether the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature. B.M.H., 179 Wn.2d at 241. Duvall asserts that Harrison cannot meet this requirement because BIF is still very young (around four years old at the time of trial). Duvall mischaracterizes the guardian ad litem's testimony as supporting her assertion. At one point during the trial on the nonparental custody petitions, the guardian ad litem said that BIF's "experience with her mother is quite different than what her older siblings experienced with their mother having been gone [in

Europe] and because the relationship and communication issues are very different for a three-year-old." This testimony does not directly bear on the issue of whether Harrison has developed a bonded, dependent relationship with the little girl. The guardian ad litem specifically addressed this factor in a supplemental report, filed on July 11, 2016, pertaining to Harrison's potential status as a de facto parent. The report concluded that Harrison had been parenting for a length of time sufficient to establish a parent-like bond with BIF:

> Joshua and [BIF] "met" when she was two months old and began living in the same household at that time. He has remained a constant part of her life ever since. Joshua treats her as his child just like her two siblings, and clearly there is a reciprocal bond of affection between Joshua and [BIF]. [BIF] was observed to call Joshua "daddy" and she sought out his attention. He was able to console her when she was upset.

Trial testimony supports the finding on the fourth factor. Duvall has not demonstrated that BIF's young age alone is sufficient reason to find that she and Harrison are not bonded. Nor is it relevant that Duvall "did not consent" to the temporary order making Harrison the primary residential parent for all three children pending trial. We conclude that the trial court did not err by concluding that Harrison is a de facto parent to BIF.

We make no award of attorney fees on appeal. Duvall is not the prevailing party, and Harrison was pro se both for the brief and for oral argument.

15

Affirmed.

Becker, J.

WE CONCUR:

Trickey, J

Schindler, J